852 A.2d 142

AMERICAN TRUCKING ASSOCIATIONS, INC., A NON–PROFIT CORPORATION, INCORPORATED UNDER THE LAWS OF THE DISTRICT OF COLUMBIA AND SUTTLES TRUCK LEASING, INC., AN ALABAMA CORPORATION, ON BEHALF OF THEM- SELVES AND OTHERS SIMILARLY SITUATED, PLAINTIFF– APPELLANTS AND CROSS–RESPONDENTS, v. STATE OF NEW JERSEY, DEFENDANT–RESPONDENT AND CROSS–AP- PELLANT.

Argued February 2, 2000—Remanded June 20, 2000—Reargued November 3, 2003—Decided July 19, 2004.

*Robert Digges, Jr.*, a member of the West Virginia bar, argued the cause for appellants and cross-respondents (*Connell Foley,* attorneys; *Mr. Digges* and *Kevin J. Coakley,* of counsel; *Mr. Coakley, Brendan Judge* and *Richard T. Bayer,* on the briefs).

*Catherine A. Tormey* and *Barbara L. Conklin,* Deputy Attorneys General, argued the cause for respondent and cross-appellant (*Peter C. Harvey,* Attorney General of New Jersey, attorney;

*Nancy Kaplen,* Assistant Attorney General and *Patrick DeAlmeida,* Deputy Attorney General, of counsel; *Ms. Tormey, Ms. Conklin* and *James M. Murphy,* Deputy Attorney General, on the briefs).

Judge KESTIN (temporarily assigned) delivered the opinion of the Court.

The issue before us in this appeal is whether this State's annual hazardous waste transporter registration fees (transporter fees) as assessed against out-of-state transporters can withstand federal Commerce Clause scrutiny. We hold, on the record developed herein, that they cannot.

## I.

This matter comes before us with a protracted procedural history. The case began with a class-action complaint filed in the Tax Court in October 1992. Plaintiffs, on federal Commerce Clause grounds, *U.S. Const.* art. I, § 8, cl. 3, challenged the validity of the hazardous waste transporter registration fee regulation promulgated in *N.J.A.C.* 7:26G–3.3(g) pursuant to *N.J.S.A.* 13:1E–18, a provision of New Jersey's Solid Waste Management legislation, *N.J.S.A.* 13:1E–1 to –223.

The State moved to transfer the matter to the Appellate Division. *See R.* 2:2–3(a)(2). In an order entered on January 3, 1994, the Tax Court denied the motion, and the Appellate Division denied the State's motion for leave to appeal. On August 3, 1994, the Tax Court denied the parties' cross-motions for summary judgment and, on October 14, 1994, certified the class.

In 1997, the parties, once again, each moved for summary judgment. The Tax Court, on March 23, 1998, granted partial summary judgment to plaintiffs, and denied the State's motion. In an oral opinion, Judge Dougherty ruled, based on the showings before her at the time, that the fees, as authorized by statute and implemented by regulation, "discriminate against interstate commerce and unduly burden interstate commerce." The State was

"permanently enjoined from the further collection of the transporter fees."

The State moved before the Appellate Division for leave to appeal and a stay pending appeal; and it moved before the Tax Court for a stay of its decision, for a stay of proceedings on plaintiffs' claims for a refund and an award of counsel fees, and for an order certifying the March 23, 1998 order as a final judgment pursuant to *Rule* 4:42–2. The Tax Court denied the latter motions, and the Appellate Division denied the motions for leave to appeal and a stay. On June 30, 1998, however, in an order reported at 154 *N.J.* 604, 713 *A.2d* 497, we granted leave to appeal and summarily remanded the matter to the Appellate Division for consideration on the merits. Shortly thereafter, the Appellate Division stayed further proceedings in the Tax Court pending resolution of the appeal, but denied the State's renewed motion for a stay of operation of the Tax Court decision.

On full consideration, in an opinion reported at 324 *N.J.Super.* 1, 734 *A.2d* 314 (1999), the Appellate Division reversed the Tax Court's grant of partial summary judgment and directed the State to apply, on notice to plaintiffs, for a "fairness" ruling from the United States Department of Transportation (USDOT) pursuant to 49 *U.S.C.A.* § 5125(g). *Id.* at 18, 734 *A.2d* at 324. The Appellate Division concluded, in the context of every state's authority to evaluate the interstate commerce impact of its hazardous waste hauling fees,

> that a final judgment, and particularly summary judgment, should not issue in this State absent critical input from the United States Department of Transportation (USDOT), which has been charged by Congress with administration of the Hazardous Materials Transportation Act (HMTA), 49 *U.S.C.A.* § 5101 to 5127, to promote uniformity and to ensure fairness of hazardous waste hauling fees imposed by the respective states.
>
> [*Id.* at 4, 734 *A.2d* at 316.]

The Appellate Division remanded the matter to the Tax Court to "retain jurisdiction pending compliance with the directions[.]" *Id.* at 18, 734 *A.2d* at 324. The panel observed, "[i]n light of the reversal and remand, and [its] prior ruling on the State's stay

application, ... that the Tax Court decision is no longer in effect. Fees hereafter collected shall be subject to refund, depending upon the outcome of further proceedings." *Ibid.*

In orders reported at 162 *N.J.* 124, 741 *A.2d* 93 (1999), we granted both parties' motions for leave to appeal. The requirement for reference to USDOT for a fairness ruling is challenged by plaintiffs and defendants. Both sides seek a ruling on the merits of the constitutional issues.

In an order reported at 164 *N.J.* 183, 752 *A.2d* 1286 (2000), we noted the existence of "controverted issues of fact concerning the actual impact of the fee on interstate carriers of hazardous materials[,]" and the need for "a well-developed record" before deciding the ultimate constitutional issues, including "the proper role of the [USDOT.]" *Ibid.* We, therefore, "summarily remanded to the Tax Court for a plenary hearing on the allegedly discriminatory economic impact of the ... fees," retaining jurisdiction. *Id.* at 184, 752 *A.2d* at 1286. Justices Long and Verniero dissented from that disposition, expressing the view that the Appellate Division's decision should be affirmed on the basis of Judge Landau's opinion because, while questions pended that were within the jurisdictional competence of USDOT, established principles of judicial restraint militated against addressing the constitutional issues. *Id.* at 184–86, 752 *A.2d* at 1286–88 (Long, J., dissenting).

On our remand, the matter was heard by Presiding Judge Small in the Tax Court. On full consideration of the evidentiary record developed, he found "the State ha[d] failed to prove that the fee does not discriminate." Applying a "presumption that a flat truck fee is violative of the Commerce Clause," he determined, based upon the facts as he found them, that the challenged fee is not valid.

## II.

The statute, *N.J.S.A.* 13:1E–18, provides in pertinent part:

a. The [State Department of Environmental Protection] may in accordance with a fee schedule adopted as a rule or regulation establish and charge annual or periodic

fees for any of the services to be performed in connection with the "Solid Waste Management Act," P.L. 1970, c. 39 (C. 13:1E–1 et seq.), except that the annual or periodic fees charged by the department to cover the costs incurred by any State agency relevant to pre-licensing investigations, post-licensing compliance monitoring or related activities under the provisions of P.L. 1983, c. 392 (C. 13:1E–126 et seq.) shall be based upon the size of the business concern. For the purposes of this subsection, "business concern" means any corporation, association, firm, partnership, sole proprietorship, trust or other form of commercial organization; "size" means the number of key employees or persons required to be listed in the disclosure statement, or otherwise shown to have a beneficial interest in the business of the applicant, permittee or licensee as defined in section 2 of P.L. 1983, c. 392 (C. 13:1E–127); and "State agency" means any State department, division, agency, commission or authority.

\* \* \*

b. The fee schedule shall reasonably reflect the duration or complexity of the specific service rendered, permit application reviewed, or registration statement or engineering design application approval sought.

The transporter registration fees must be paid only by transporters who collect or deliver hazardous waste in New Jersey. Those who merely travel across the State are not subject to the requirement.

The registration process requires transporters to provide the State Department of Environmental Protection (DEP) with the vehicle's license plate, the vehicle identification number assigned by the Division of Motor Vehicles, ownership and insurance information, and payment of the fee. The DEP then issues a decal for each cab, trailer or container bearing a unique identification number. The decal number allows the DEP to track the owners of an individual transporter unit. New Jersey law prohibits treatment, storage and disposal facilities from accepting waste from a transporter unless it has a decal affixed.

Judge Landau's précis of *N.J.A.C.* 7:26G–3.3(g), the challenged regulation, as it stood before the Appellate Division in 1999 was:

At the time the complaint was filed, the hazardous waste transporter fees were codified at then *N.J.A.C.* 7:26–4A.3(g)(1). Effective October 21, 1996, the transporter fees were recodified at *N.J.A.C.* 7:26G–3.3(g). 28 *N.J.R.* 1693(a); 28 *N.J.R.* 4606(a). The rates were modified slightly, lowering the annual amounts due, but retaining the same structure:

(g) The fee schedule for hazardous waste transporters is as follows:

.

1. All hazardous waste transporters shall pay an annual registration fee. A State of New Jersey hazardous waste transporter registration decal will be issued for each hazardous waste cab and transport unit (as defined at *N.J.A.C.* 7:26G–4.2) for which a fee is paid. The fee registration year shall extend from October 1 through the following September 30. The fee shall accompany the submission of the annual registration application. All vehicles registered with the Department must be owned or leased by the applicant. If the vehicle is leased, a copy of the lease must be submitted with the registration application. The registration of a hazardous waste transporter is nontransferable and fees are not refundable. The annual registration fees are as follows:

i. Each hazardous waste cab: $21.00;

ii. Each hazardous waste transport unit, either detachable or with a permanently attached hazardous waste cab, having a capacity less than or equal to one ton (one ton = one cubic yard = 200 gallons): $85.00;

iii. Each hazardous waste transport unit without a hazardous waste trailer having a capacity greater than one ton (one ton = one cubic yard = 200 gallons): $191.00; and

iv. Each hazardous waste transport cab with permanently attached hazardous waste transport unit with a capacity greater than one ton (one ton = one cubic yard = 200 gallons): $212.00

[324 *N.J.Super.* at 6, 734 *A.*2d at 317.]

Judge Small, in his opinion, also noted that the flat fees per vehicle had been somewhat higher before 1996. The regulation, as currently promulgated, has a biennial structure with rates that are, marginally, even lower on an annual basis.[1]

Judge Small stated:

As a consequence of this litigation no fees have been collected from the plaintiff class since 1998. The [DEP] has indicated its intention to collect those fees if and when it prevails in the litigation.

The DEP imposes other fees and regulations on transporters of hazardous waste. Under the A–901 program, individuals and corporations wishing to be licensed to transport hazardous waste in New Jersey must undergo extensive background checks at the substantial cost of $900. *N.J.S.A.* 13:1E–126 to –207. Under the hazardous waste transporter fee statute once the companies and individuals are licensed and their equipment is licensed and registered each pick-up or drop-off of hazardous waste in New Jersey must be documented by a multipart manifest. The fee for each manifest is $9 and is paid by the generators of hazardous waste. Neither the A–901 fee nor the manifest fees are challenged in this case, only the annual per vehicle registration fee is challenged.

---

[1] The biennial structure and modified rates were proposed on November 19, 2001, 33 *N.J.R.* 3853–54, and adopted on May 6, 2002, 34 *N.J.R.* 1712–13.

With the completion of the remand proceedings mandated in our order of June 20, 2000, 164 *N.J.* 183, 752 *A.*2d 1286, both the resulting Tax Court ruling of March 14, 2003, and the Appellate Division decision of June 15, 1999, on appeal from the earlier Tax Court order granting partial summary judgment to plaintiffs, 324 *N.J.Super.* 1, 734 *A.*2d 314, are now before us for review. Our order of June 20, 2000, summarily remanding "for a plenary hearing on the allegedly discriminatory economic impact of the hazardous waste transporter fees[,]" 164 *N.J.* at 184, 752 *A.*2d at 1286, was based on the need for "a well-developed record" in this "especially fact-sensitive" matter, to "better enable [us] to determine the proper role of the United States Department of Transportation under the provisions of the Hazardous Materials Transportation Uniform Safety Act of 1990, now codified in 49 *U.S.C.A.* § 5101 to 5127[.]"[2] *Id.* at 183, 752 *A.*2d at 1286. Jurisdiction was otherwise retained. *Id.* at 184, 752 *A.*2d at 1286. Thus, we are now called upon to evaluate the matter in the light of Judge Landau's opinion and the record upon which it was based, as well as Judge Small's findings and conclusions.

### III.

The showings of the parties in the initial Tax Court proceeding and the trial court's treatment of those showings were summarized in the Appellate Division opinion, 324 *N.J.Super.* at 6–9, 734 *A.*2d at 317–19. Additional proofs were presented in the remand proceeding.

Plaintiff's experts had conducted several analyses to quantify the impact of the transporter fees on interstate commerce by comparing the cost per activity between intrastate and interstate transporter companies. Some data limitations impaired the attempts of both parties to analyze the impact of the fees on

---

[2] In 1994, the title of the legislation was changed to the "Hazardous Materials Transportation Act." Those amendments are embodied in the codification at 49 *U.S.C.A.* § 5101 to § 5127.

interstate commerce. For example, plaintiffs' data had been compiled at the company level and not on a per-vehicle basis; and, the State had no reliable data for periods before 1993.

In most of their analyses, plaintiffs characterized "New Jersey transporters" (NJ) as having eighty percent or more of their truck fleet bases registered in New Jersey, and "non-New Jersey transporters" (NNJ) as having eighty percent or more of their fleets registered outside of New Jersey.[3] Plaintiffs' experts conducted several comparisons of fees per level of activity: 1) fees per manifest; 2) fees per ton of hazardous waste hauled using the 80% definitions and excluding one out-of-state company, Safety Kleen, that had a very large New Jersey presence; 3) fees per ton of hazardous waste hauled using the State's definition of NJ and NNJ companies and excluding Safety Kleen; and 4) fees per ton of hazardous waste hauled using the proffered definitions of NJ and NNJ companies, and including all companies. The same experts offered costs-per-activity analyses in several forms. According to their statistics, irrespective of which methodology was used, NNJ companies paid more per manifest and more per ton of hazardous waste hauled than NJ transporters for all the years analyzed. The most conservative estimates, including Safety Kleen in the NNJ data, indicated that NNJ transporters paid between 1.9 and 2.6 times more per ton hauled than NJ transporters.

The State argued that the more appropriate way to distinguish between NJ and NNJ transporters is to use identification numbers assigned by the United States Environmental Protection Agency. The State's expert conducted an analysis accordingly, comparing the market shares in annual ton hauled of NNJ and NJ haulers between 1993 and 2000. The results showed that between 1993 and 2000, the market share of NNJ companies increased

---

[3] We discern that those ranges resulted in omissions from the analyses of data relating to a potentially significant number of transporters in each category, *i.e.,* those whose fleets were in the twenty percent to eighty percent ranges.

from 54% to 59% for small companies (those with less than 1% of all waste transported in any given year), and also increased from 45% to 48% among the large companies (those with more than 1% market share).

## IV.

The essential questions of law in the matter revolve about whether the fees at issue discriminate against interstate commerce or unduly burden interstate commerce. Judge Small reported in his opinion:

> The parties set about proving and disproving the existence of discrimination under the Commerce Clause of the United States Constitution . . . in two fundamentally different ways. The plaintiffs, a class of interstate truckers with tractors and trailers base registered outside of New Jersey presented expert testimony which showed that the cost (or tax) per manifest of hazardous waste shipped (a surrogate for the total number of shipments) and the cost (or tax) per ton of hazardous waste shipped (a surrogate for the level of hazardous waste handling activity) attributed to the hazardous waste transporter fees for out-of-state companies was a multiple of the cost per manifest and cost per ton of comparable New Jersey companies. The defendant demonstrated that between 1993 and 2001 the number of out-of-state waste haulers operating in New Jersey did not decline in absolute numbers nor did the out-of-state haulers' relative share of the market vis-a-vis New Jersey haulers decline. The defendant's expert opined that if the fee did discriminate as a matter of fact those numbers should have declined. Since they didn't he concluded that the fee did not discriminate against out-of-state haulers.

Judge Small found the evidence on both sides deficient:

> Despite the long history of this case, the large record, and the skilled and sustained advocacy of counsel, after careful review of the evidence, I find that much of the evidence is not relevant, as a matter of law. I further find the evidence is inconclusive as to whether the challenged fees do or do not discriminate against the plaintiff class (in large part because the data did not permit analysis comparing members of the class to non-members and the methods used to define surrogate groups to represent the class are unreliable).

Specifically with respect to plaintiffs' showings, Judge Small found their analysis to be

> flawed (1) by a lack of data which would have linked the fees imposed to specific vehicles rather than the available data linking fees to individual companies, (2) by an analysis based on number of trips as opposed to tonnage hauled, and (3) by its arbitrary definition of out-of-state v. in-state truckers (those with 80% or more of its vehicles base registered outside of New Jersey and those with 80% or more of

its vehicles base registered in New Jersey—excluding from the analysis those with vehicles base registered in or out of New Jersey at lower percentages).

And, he concluded that the State's

form of analysis chosen was incapable of segregating the impact of the hazardous waste transporter fee on the behavior of hazardous waste transporters from the impact of every other factor that may have motivated that behavior. Additionally, the failure to look at behavior before and after the fees were imposed but only during a period commencing four years after the fee was imposed has no basis in logic or scientific method as supporting any conclusion about the impact of the fee.

In analyzing the proofs presented, Judge Small posited, as a beginning point, the rule of *American Trucking Ass'ns v. Scheiner*, 483 *U.S.* 266, 107 *S.Ct.* 2829, 97 *L.Ed.*2d 226 (1987), that flat taxes or fees, *i.e.*, impositions not related to activity, are unconstitutional. He observed:

Although [plaintiffs'] method was more revealing than that chosen by the State to measure discrimination as a matter of logic or law, it too failed to convince me that the transporter fee is or is not as a matter of fact discriminatory. Based on the evidence before me, I can make no conclusion about the discriminatory or non-discriminatory impact of the hazardous waste transporter fee on New Jersey and non-New Jersey hazardous waste transporters. As a matter of law the fee, a flat fee, not shown to be non-discriminatory is in violation of the Commerce Clause of the United States Constitution even though the parties have agreed that the total amount collected does not exceed the costs of administering the program. Absent proof to the contrary, there is a legal presumption dating to [*Scheiner*] that a flat truck registration fee, not based on activity is presumed to be discriminatory against interstate as opposed to intrastate activity.

\* \* \* \*

In [*Scheiner*], the Supreme Court of the United States found that a flat tax imposed by Pennsylvania on both interstate and intrastate motor carriers on the basis of the number of axles of the truck was *per se* unconstitutional. The plaintiffs assert that under [*Scheiner*] and subsequent interpretations by lower courts, the New Jersey hazardous waste transporter fees must fail. The State argues under a line of cases starting with *Evansville–Vanderburgh Airport Auth. Dist. v. Delta Airlines*, 405 *U.S.* 707, 92 *S.Ct.* 1349, 31 *L.Ed.*2d 620 (1972), that the New Jersey hazardous waste transporter fee is a user fee not violative of the Commerce Clause. There is a fundamental difference between the fees imposed and found unconstitutional in [*Scheiner*] and those approved in [*Evansville*]. The fees in [*Scheiner*] were an annual per vehicle fee—just like the fees at issue in this case. In [*Evansville,*] the airport fee (a head tax) was based on activity, the enplaning of individual passengers, similar to the New Jersey $9 per manifest fee not challenged in this case.

In a prior bench opinion, another judge of this court held that the fee in question was violative of the Commerce Clause because it failed the internal consistency test. Thus, if each state imposed the tax, those engaged in interstate commerce

would pay multiple fees and those engaged in commerce in one state would pay a single fee. Fees which satisfy the internal consistency test are fees paid in one state, which are credited against other states' fees or are paid in lieu of other states fees (*i.e.,* automobiles need be registered in only one state, to travel in all states). *Complete Auto Transit, Inc. v. Brady,* 430 *U.S.* 274, 97 *S.Ct.* 1076, 51 *L.Ed.*2d 326 (1977). In this case, the Appellate Division held that such a ruling on the constitutionality of the tax was unnecessary in that Congress had enacted, under its commerce power authority, 49 *U.S.C.A.* § 5125(g), the Hazardous Materials Transportation Unfair Safety Act of 1990 which included a requirement that statutes like the New Jersey hazardous waste transporter fee be "fair." Thus Judge Landau opined that, having entered the field, Congress had pre-empted the standards by which New Jersey's statutes would be measured against the Commerce Clause and established a standard of "fairness." The Court reasoned that, in order to foster uniformity, "fairness" should be decided by the United States Department of Transportation. *See Quill Corp. v. North Dakota,* 504 *U.S.* 298, 112 *S.Ct.* 1904, 119 *L.Ed.*2d 91 (1992)(discussing the Commerce Clause and Congress's power to regulate commerce between the states).

Noting that the State had asserted " 'the fee only covers the administrative cost of the program' " and that "the parties [had] stipulated for the purpose of this litigation that the costs of regulating the hazardous waste industry in New Jersey is equal to or greater than the fee collected[,]" Judge Small observed: "the issue remains as to whether that fee is constitutionally and fairly apportioned between in-state and out-of-state carriers."

Therefore, in this proceeding before me the State went first. Flawed as the plaintiff's evidence may be, since the United States Supreme Court's decision in [*Scheiner*], courts have consistently held that flat taxes (taxes not related to activity) like the ones in this matter are unconstitutional. *American Trucking Ass'ns v. Secretary of State,* 595 A.2d 1014 (Me.1991), *American Trucking Ass'ns v. State,* 205 *Wis.*2d 494, 556 *N.W.*2d 761 (Ct.App.)[, *review denied,* 207 *Wis.*2d 285, 560 *N.W.*2d 274] (1996). The state's assertion that the consequence of New Jersey's tax is that no foreign based carriers have withdrawn from New Jersey as a result of this tax is flawed, in that the start date is four years after the imposition of the tax, and irrelevant as a matter of law.

Judge Small commented further on the parties' proofs, beginning with the State's evidence:

The State's position is that the fee is a minor part of a hauler's costs; it represents approximately 3% of the hauler's gross revenue. Such a small factor cannot influence behavior; and if it does not influence behavior (*i.e.,* deter out-of-state haulers from entering the New Jersey market), it cannot discriminate. This position is at odds with the legal test for discrimination. The issue is not whether the fee influences interstate haulers' behavior. The fee discriminates if it imposes a cost on out-of-state haulers out of proportion to any additional costs they may

impose on New Jersey when compared to New Jersey waste haulers. If the costs imposed on the state by in-state and out-of-state haulers are equivalent, but out-of-state haulers are charged a fee which, measured by the New Jersey activity, is greater than the fee imposed on New Jersey haulers per New Jersey activity then the fee unconstitutionally discriminates against interstate commerce. There was no evidence that out-of-state haulers imposed a higher cost on New Jersey than did the in-state haulers.

The State presented two fact witnesses, and an expert.

The first fact witness explained how the program worked. The parties have stipulated for purposes of this litigation that the cost of regulating the hazardous waste transportation industry is at least as much as the fees collected. The second fact witness testified that transporters were not deterred by the fee to enter the New Jersey market, that the key determinant of the decision to enter the New Jersey market was the proximity of a garage or other facility to Linden, New Jersey.

Turning to plaintiffs' showings in an effort to countervail the State's proofs, the judge saw their expert's analysis,

when boiled down to its essence, [to have been] that, from a period four years after the tax was imposed, the number of out-of-state carriers active in New Jersey did not decline and their number relative to the number of New Jersey carriers did not decline. Even assuming for a moment that he had properly started his study prior to the imposition of the fee (he did not because he could not assemble the data—*see Glen Wall Assocs. v. Wall Twp.*, 99 *N.J.* 265, 284, 491 A.2d 1247[, 1257] (1985), warning courts not to impose costly burdens of proof on parties in tax cases) his logic would lead to a conclusion that the fee was not a barrier to the entry of out-of-state haulers into the New Jersey market. But that is not the legal test. It is obvious that a $25 per year fee (amounting to a small percentage of a hauler's total costs) will have an insignificant effect on out-of-state haulers' decisions to either enter or leave the market. The legal test is: does the fee impose a greater cost on out-of-state haulers than on in-state haulers, and if it does has the State proven that out-of-state haulers impose greater costs on the state than do in-state haulers?

Judge Small evaluated the parties' respective showings as follows:

Plaintiff[s'] expert used the available data to show the aggregate out-of-state haulers' allocation of the flat fee resulted in a cost per manifest (a manifest is required for each trip of hazardous waste in New Jersey) significantly higher than the costs per manifest for New Jersey haulers. The defendant[ ] spent a great deal of time criticizing this analysis and focused on three issues.

(1) The definition of a non-New Jersey hauler;

(2) The analysis per manifest rather than per ton (i.e. amount of waste hauled);

(3) The analysis on an aggregate rather than a per truck basis.

As a matter of logic, there is much to support the State's criticism—and at its root it lies with the fact that data is kept by company and not by truck.

But in the end, a flat tax is presumptively unconstitutional under *American Trucking Ass'ns v. Scheiner, supra.* The burden of proving that it does not discriminate is on the defender of the tax. The State's fundamental hypothesis proves nothing. Assuming that the State's analysis shows that no out-of-state hauler withdrew from New Jersey for a period commencing four years after the fee was imposed, it has not shown that the fee does not discriminate against non-New Jersey waste haulers. The State has not attempted to show that the fee fell more or less heavily on in-state or out-of-state haulers.

The State's criticisms of [plaintiffs'] proofs make it difficult for me to conclude that the flat fees fell more or less heavily on plaintiffs than on New Jersey based haulers. Whether the problem is with the definition of which companies are out-of-state haulers (those with 80% or more of their vehicles base registered outside of New Jersey are considered out-of-state haulers) as opposed to which trucks are based out-of-state—or whether it is better to do an analysis based on trips or tonnage—the burden of proof to show that the tax does not discriminate is on the State—and it has failed to meet that burden.

In respect of the weight to be accorded the parties' proofs, Judge Small determined and concluded:

Although the parties have gone to great lengths to prove that the hazardous waste transporter fee does or does not discriminate against non-New Jersey waste haulers, both have failed to persuade me.

Plaintiff's analysis is flawed because:

(1) It used data which was not disaggregated by trucks *but by* company and interstate companies have vehicles base registered both inside and out of New Jersey.

(2) It used an arbitrary definition of New Jersey waste haulers which defendant showed would yield substantially different results if altered so that one other "out-of-state" company with less than 80% of its vehicles (but more than 50%) which were registered outside of New Jersey were included as an "out-of-state" hauler.

Defendant's analysis is flawed because it is based on a before and after comparison, in which the dividing line for before and after is 1993 (an arbitrarily chosen date based on available data) [and] is irrelevant for a tax which was imposed in 1989. Furthermore, even assuming that the state could show that no out-of-state hauler withdrew after 1989, given the parties' concession that the fee was an insignificant part of a waste hauler's cost, it would not have proven anything about the relative burden on intrastate and interstate carriers. Discrimination or burden need not be a motivating factor of behavior before it is found to be discriminatory.

*American Trucking Ass'ns v. Scheiner, supra,* held that: flat fees imposed by individual states for the privilege of conducting a business in the state are unconstitutional if they are not tied to specific activity (*i.e.* per use like the $9 per manifest fee in this case) or are not subject to a credit if paid to another state (*i.e.* a vehicle need be registered in only one state in order to use the roads of another). New Jersey's hazardous waste transporter fee thus is discriminatory.

Nevertheless, the parties, despite *Glen Wall, supra,* have expended much time and expense in an attempt to prove that New Jersey's tax does or does not discriminate against interstate commerce.

The cross-examination of each side's witnesses has been far more effective than their direct testimony. [Plaintiffs] have effectively shown that [defendant has] not proven that the fee does not discriminate against interstate commerce. By showing that the number of non-New Jersey based companies participating in the New Jersey market has not declined (for a period commencing four years after the imposition of the fee) the State has proven nothing of constitutional significance.

Lack of adequate data to test a valid hypothesis will not lead to this Court's adoption of a meaningless analysis to prove a legally irrelevant hypothesis.

Judge Small held:

Although [plaintiffs'] proofs are flawed, the burden is on defendant[ ] and unless defendant[ ] can show that the fee meets the internal consistency test of the Commerce Clause, or is not imposed disproportionately on out-of-state haulers, it must fail.

Accordingly, neither side has proven what the relative impact of the fee is on in-state and out-of-state haulers.

As to whether the fees challenged in this case are "fair" under the federal statutes, unless a showing (in accord with the stipulated facts of this case) that the fees are all used to regulate the hazardous waste transportation industry is sufficient to constitute "fairness", the State cannot prevail. A federal action invalidating a fee like New Jersey's relied on Commerce Clause standards to determine fairness. *See American Trucking Ass'ns v. New Jersey,* 164 *N.J.* 183, 186, 752 *A.*2d 1286, 1287–88 (2000) (Long, J., dissenting) (citing *Tennessee Hazardous Waste Transporter Fee and Reporting Requirements,* 64 *Fed. Reg.* 54473–54481 (October 6, 1999)).

In the absence of proof of non-discrimination or fairness, and under the presumption that a flat truck fee is violative of the Commerce Clause, I am compelled [to] find that the fee challenged in this case is not valid.

## V.

The State's principal argument on appeal is that the transporter fee mechanism should be evaluated by the fairness standard of 49 *U.S.C.A.* § 5125(g), and that that standard effectively displaces Commerce Clause analysis in appraising the validity of the scheme. Nevertheless, the State concedes that the fairness standard, itself, is informed, to some extent, by Commerce Clause jurisprudence, specifically, the test for user fees. It argues, however, that plaintiffs have failed to prove the transporter fee is not 'fair' under the HMTA. Under the Commerce Clause standard

for 'user fees' applied in *Evansville–Vanderburgh Airport Authority Dist. v. Delta Airlines,* 405 *U.S.* 707, 92 *S.Ct.* 1349, 31 *L.Ed.*2d 620 (1972); *see also Northwest Airlines v. County of Kent,* 510 *U.S.* 355, 369, 114 *S.Ct.* 855, 864, 127 *L.Ed.*2d 183, 196–97 (1994), the State argues, plaintiffs have failed to prove the transporter fee is not "a fair approximation of use or privilege for use" and is discriminatory or excessive in consideration of the benefits conferred.

The State's claim that plaintiffs have not proved any disparate impact of the fee is based on several contentions: 1) the level of activity of a hazardous waste hauler is impacted by many economic and market factors ignored by plaintiffs' analysis; 2) the impact of the fees on activity is miniscule, and hence not an undue burden; 3) the analysis is flawed because the definitions of an NNJ transporter and an NJ transporter are based on a misleading and artificial formula; 4) the use of manifests is inappropriate because manifests bear no relation to tonnage hauled or services provided; and 5) the use of tonnage is inappropriate because it is based on aggregated data—individual transporter data is sometimes inconsistent with this, and, like all other analyses conducted by plaintiffs, it ignores the impact of non-fee factors on business activity.

The State argues that DEP cannot calculate an hourly value for its transporter enforcement services and hence is unable to apportion costs among the regulated community. Therefore, for administrative convenience, DEP spreads costs uniformly over the population of registered trucks on a "per-capita" basis. The State argues that any further refinement would be impracticable.

Plaintiffs cite *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.,* 514 *U.S.* 175, 115 *S.Ct.* 1331, 131 *L.Ed.*2d 261 (1995), for the proposition that a state tax or fee that fails the "internal consistency" test is, as a matter of law, unconstitutional as discriminatory. Hence, plaintiffs argue, because the transporter fees do not satisfy the test, we need not consider the actual impact of the transporter fees, *i.e.,* the undueness of the burden, to find them unconstitutional.

Plaintiffs assert they have shown, by various methodologies, including those suggested by the State, that the transporter fees, in fact, discriminate against interstate commerce. Plaintiffs argue that Judge Small disregarded undisputed evidence that the transporter fees have an inherent discriminatory impact on interstate transporters. Plaintiffs also argue that the judge ignored the analysis that showed out-of-state haulers paid between 1.9 and 2.6 times the amount New Jersey companies paid per ton of hazardous waste hauled.

Plaintiffs contend that their experts' analysis of fees per ton hauled based on company headquarters designations utilized the best data available while meeting all of the State's criticisms. They argue that Judge Small, when he held they had failed to establish the discriminatory impact of the fees, erred by not viewing the expert evidence practically and within realistic limits, as required by *Glen Wall Assocs. v. Wall Twp.*, 99 *N.J.* 265, 280–281, 491 *A.*2d 1247, 1255–56 (1985).

Alternatively, plaintiffs assert, even if the Court finds the applicable standard is "fairness" as set forth by the HMTA, or the *Evansville* test rooted in the Commerce Clause, the flat fees are still invalid because they are not fairly apportioned and they discriminate in fact by charging fees to hazardous waste haulers that are unrelated to their level of activity in New Jersey.

## VI.

The first question for our determination is whether Judge Small correctly assigned the burden of proof in the matter in reaching his findings and conclusions that the State had not met its burden. That, too, is a matter of federal constitutional law.

■ The party challenging the validity of a state statute on federal Commerce Clause grounds commonly bears the burden of proof. *Hughes v. Oklahoma*, 441 *U.S.* 322, 336, 99 *S.Ct.* 1727, 1736, 60 *L.Ed.*2d 250, 261–62 (1979). Nevertheless, if a statute, on its face or in practical effect, discriminates against interstate

commerce, the burden shifts to the state " 'to justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake.' " *Id.,* 441 *U.S.* at 336, 99 *S.Ct.* at 1736, 60 *L.Ed.*2d at 262 (quoting *Hunt v. Washington Apple Advertising Comm'n,* 432 *U.S.* 333, 353, 97 *S.Ct.* 2434, 2446, 53 *L.Ed.*2d 383, 400 (1977)).

When unapportioned state fees and taxes are at issue, the United Stated Supreme Court has developed a stricter test, holding that such a fee or tax is unconstitutional if it violates the internal consistency test of *Complete Auto Transit, Inc. v. Brady, supra,* 430 *U.S.* 274, 97 *S.Ct.* 1076, 51 *L.Ed.*2d 326. *See American Trucking Ass'ns, Inc. v. Scheiner, supra,* 483 *U.S.* at 284, 107 *S.Ct.* at 2840, 97 *L.Ed.*2d at 243. In *Oklahoma Tax Comm'n v. Jefferson Lines, Inc., supra,* 514 *U.S.* at 185, 115 *S.Ct.* at 1338, 131 *L.Ed.*2d at 271–72, the Court clearly held that a tax that fails the internal consistency test of *Complete Auto Transit* is *per se* unconstitutional.

If a less stringent constitutional test were to be applied, plaintiffs would retain the burden to prove that the fee discriminates in practical effect. That showing is required by the tests applied in *Evansville, supra,* 405 *U.S.* at 716–17, 92 *S.Ct.* at 1355–56, 31 *L.Ed.*2d at 628–29, and in *Pike v. Bruce Church, Inc.,* 397 *U.S.* 137, 142, 90 *S.Ct.* 844, 847, 25 *L.Ed.*2d 174, 178 (1970). State regulations that are not discriminatory are analyzed under the *Pike* undue burden test. *Camps Newfound/Owatonna, Inc. v. Town of Harrison,* 520 *U.S.* 564, 582 n. 16, 117 *S.Ct.* 1590, 1602 n. 16, 137 *L.Ed.*2d 852, 869 n. 16 (1997).

█ Plaintiffs, of course, had the initial burden to show that *Scheiner* applies, *i.e.,* that the fee is unapportioned. If *Scheiner* controls, the burden then shifts to the State to show either that the fee is not discriminatory, or alternatively, that a more accurately apportioned fee is impracticable.

## A.

■ Before determining whether *Scheiner* dictates the beginning point of analysis, we must first address the State's argument that the usual Commerce Clause limitations were displaced by the HMTA. Congress's adoption of the predecessor act in 1975 was designed to provide a basis in law for regulating the safe transport of hazardous materials under a uniform national scheme. Section 5125 of the HMTA sets out pre-emption rules governing state requirements related to hazardous waste transport. That section authorizes a state authority to "impose a fee related to transporting hazardous material only if the fee is fair and used for a purpose related to transporting hazardous material[.]" 49 *U.S.C.A.* § 5125(g)(1).

■ We are not persuaded by the State's argument that § 5125 insulates the fees at issue from dormant Commerce Clause control. Before a statute is read to authorize state regulations that burden or discriminate against interstate commerce, "Congress must manifest its unambiguous intent ... to permit or to approve such a violation of the Commerce Clause[.]" *Wyoming v. Oklahoma*, 502 *U.S.* 437, 458, 112 *S.Ct.* 789, 802, 117 *L.Ed.*2d 1, 24–25 (1992); *see also Hillside Dairy, Inc. v. Lyons*, 539 *U.S.* 59, 66, 123 *S.Ct.* 2142, 2147, 156 *L.Ed.*2d 54, 61 (2003). The required showing is that "Congress affirmatively contemplate[d] otherwise invalid state legislation" and made it unmistakably clear that it nevertheless authorized such legislation. *South–Central Timber Dev., Inc. v. Wunnicke*, 467 *U.S.* 82, 91–92, 104 *S.Ct.* 2237, 2241–42, 81 *L.Ed.*2d 71, 79 (1984).

In *Hillside Dairy, supra,* 539 *U.S.* at 65–66, 123 *S.Ct.* at 2146–47, 156 *L.Ed.*2d at 61, the Court explained that § 144 of the Federal Agriculture Improvement and Reform Act of 1996, did not remove California's milk pricing and pooling regulations from Commerce Clause scrutiny. Section 144, codified at 7 *U.S.C.A.* § 7254, provides:

Nothing in this Act or any other provision of law shall be construed to preempt, prohibit, or otherwise limit the authority of the State of California, directly or

indirectly, to establish or continue to effect any law, regulation or requirement regarding 1) the percentage of milk solids or solids not fat in fluid milk products sold at retail or marketed in the State of California; or 2) the labeling of such fluid milk products with regard to milk solids or solids not fat.

The Court held that while the statute clearly contemplated California laws regulating the composition and labeling of milk products and excluded them from Commerce Clause scrutiny, laws regulating pricing were not exempt from such scrutiny because § 144 did not address milk pricing and pooling laws. No adequately specific intent to that end was apparent on the face of the statute. *Ibid.*

As noted by the Appellate Division, 49 *U.S.C.A.* § 5125(g), which exists in the context of a section dealing with the subject of pre-emption, specifically addresses state imposition of fees as follows:

(1) A State, political subdivision of a State, or Indian tribe may impose a fee related to transporting hazardous material only if the fee is fair and used for a purpose related to transporting hazardous material, including enforcement and planning, developing, and maintaining a capability for emergency purposes.

(2) A State or political subdivision thereof or Indian tribe that levies a fee in connection with the transportation of hazardous materials shall, upon the Secretary's request, report to the Secretary on—

(A) the basis on which the fee is levied upon persons involved in such transportation;

(B) the purposes for which the revenues from the fee are used;

(C) the annual total amount of the revenues collected from the fee; and

(D) such other matters as the Secretary requests.

■ In the light of the "unambiguous intent" rule referred to in *Wyoming v. Oklahoma* and *South–Central Timber* as applied in *Hillside Dairy,* we disagree with the Appellate Division's conclusion that a "fairness" determination by the Secretary of Transportation, for the stated statutory purpose of avoiding a pre-emption bar, could have a dispositive impact on the question of law whether Congress has evinced an unambiguous intent to preclude application of the Commerce Clause to the fees at issue here. In the absence of a demonstrable intent on the part of Congress to preclude Commerce Clause restraints, no state is at liberty to act in a way that discriminates against or unduly burdens interstate

commerce. In *Hillside Dairy,* the language of the statute at issue there was held to satisfy the "unambiguous intent" standard regarding the clearly expressed choice not to limit the state's authority in milk composition and labeling laws; but, in the absence of an equally clear expression regarding milk pricing and pooling laws, Commerce Clause limitations could not be avoided in the latter respects.

49 *U.S.C.A.* § 5125(g) authorizes the states to impose fees "related to transporting hazardous material *only* if the fee is fair and used for a purpose related to transporting hazardous material[.]" (Emphasis supplied.) If a fee meets that standard, USDOT has the authority to waive pre-emption principles in order to permit its imposition. Nothing in the language of the statute, however, "makes unmistakably clear" Congress's intent to remove transport fees from Commerce Clause scrutiny, *i.e.,* respecting issues of discrimination or undue burden. *See American Trucking Ass'ns, Inc. v. State of Wisconsin,* 205 *Wis.*2d 494, 556 *N.W.*2d 761, 765 (Ct.App.), *review denied,* 207 *Wis.*2d 285, 560 *N.W.*2d 274 (1996).

### B.

The next question we must address bears upon the State's argument that the transporter fee mechanism is not a tax and should be evaluated under the standards governing user fees. *See, e.g., Franks & Son, Inc. v. State,* 136 *Wash.*2d 737, 966 *P.*2d 1232 (1998), *cert. denied,* 526 *U.S.* 1066, 119 *S.Ct.* 1458, 143 *L.Ed.*2d 544 (1999). It is "the practical effect of [the] challenged tax" that is determinative. *Commonwealth Edison Co. v. Montana,* 453 *U.S.* 609, 615, 101 *S.Ct.* 2946, 2951, 69 *L.Ed.*2d 884, 893 (1981). The State argues that the transporter fees are regulatory user fees of the type that have been upheld in other contexts and, therefore, should not be evaluated based on the internal consistency test applicable to taxes.

In *Evansville, supra,* 405 *U.S.* 707, 92 *S.Ct.* 1349, 31 *L.Ed.*2d 620 (1972), the state and municipality charged passengers a $1 fee

each time they enplaned a commercial airliner. All passengers were charged the same fee, regardless of whether they were interstate or intrastate travelers. The funds were used to help defray the costs of airport construction and maintenance. *Id.* at 709–710, 92 *S.Ct.* at 1351–52, 31 *L.Ed.*2d at 624–25. The Court applied the following test:

> At least so long as the toll is based on some fair approximation of use or privilege for use ... and is neither discriminatory against interstate commerce nor excessive in comparison with the governmental benefit conferred, it will pass constitutional muster, even though some other formula might reflect more exactly the relative use of the state facilities by individual users.
>
> [*Id.* at 716–717, 92 *S.Ct.* at 1354–55, 31 *L.Ed.*2d at 629.]

The fees in *Evansville* satisfied the standard because all travelers paid the same fee on a per-use basis, and the fee "reflect[ed] a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed." *Id.* at 717, 92 *S.Ct.* at 1355, 31 *L.Ed.*2d at 629.

■ If, on the other hand, the transporter imposts are viewed as taxes, they can be upheld only if they satisfy a stricter, four-part standard. A state tax on interstate commerce does not violate the Commerce Clause if it "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Complete Auto Transit, Inc. v. Brady, supra,* 430 *U.S.* at 279, 97 *S.Ct.* at 1079, 51 *L.Ed.*2d at 331.

■ In *Oklahoma Tax Comm'n v. Jefferson Lines, Inc., supra,* 514 *U.S.* 175, 183–85, 115 *S.Ct.* 1331, 1337–38, 131 *L. Ed.*2d 261, 270–72 (1995), the Court reaffirmed the four-prong test of *Complete Auto Transit* and explained further that a fairly apportioned tax is one that is both internally and externally consistent. The Court in *Jefferson Lines* stated that the internal consistency test

> asks nothing about the degree of economic reality reflected by the tax, but simply looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate. A failure of internal consistency shows as a matter of law that a State is attempting to take more than its fair share of taxes

from the interstate transaction, since allowing such a tax in one State would place interstate commerce at the mercy of those remaining States that might impose an identical tax.

[Id. at 185, 115 *S.Ct.* at 1338, 131 *L.Ed.*2d at 271–72.]

A state's tax may not reach "beyond that portion of value that is fairly attributable to economic activity within the taxing state." *Ibid.* The Court in *Jefferson Lines* upheld a sales tax on tickets for bus travel that originated in Oklahoma, regardless of whether the travel was interstate or intrastate. Because the tax was assessed only if Oklahoma was the point of departure, the imposition by other States of the same type of tax would not place interstate travelers at a disadvantage compared to intrastate travelers; everyone would pay one tax per trip, and it would be paid in the state of departure.

In *American Trucking Ass'ns v. Scheiner, supra,* 483 *U.S.* 266, 107 *S.Ct.* 2829, 97 *L.Ed.*2d 226, the Court applied the test of *Complete Auto Transit v. Brady* in striking down two lump-sum annual taxes imposed by Pennsylvania on operators of trucks using Pennsylvania highways. The first tax was a $25 flat "marker" fee introduced in 1980 for trucks over a specified weight, but excluding trucks registered in Pennsylvania, which were deemed to have paid the charge as part of their motor vehicle registration fees. *See id.* at 273–74, 107 *S.Ct.* at 2835, 97 *L.Ed.*2d at 236. The second was a $36 per axle tax introduced in 1982 for all trucks over a specified weight, regardless of state of registration, with provisions for rebates and exemptions for infrequent users. *See id.* at 274, 107 *S.Ct.* at 2835, 97 *L.Ed.*2d at 237. Pennsylvania had structured both taxes so that, effectively, only out-of-state truckers were required to pay them.

The Court held that both taxes failed the internal consistency test, because "if each State imposed flat taxes for the privilege of making commercial entrances into its territory, there is no conceivable doubt that commerce among the States would be deterred." *Id.* at 284, 107 *S.Ct.* at 2840, 97 *L.Ed.*2d at 243. In addition, the taxes were seen as discriminatory in practical effect, because the fee charged to out-of-state truckers imposed a cost

per mile that was five times greater than that paid by the in-state truckers. *See id.,* 483 *U.S.* at 286, 107 *S.Ct.* at 2841–42, 97 *L.Ed.*2d at 244–45. Finally, the taxes failed the fourth prong of *Complete Auto Transit* because, having no relationship to activity within the state, they posed an undue burden on interstate commerce. *See id.* at 291, 107 *S.Ct.* at 2844, 97 *L.Ed.*2d at 247–48.

The Court distinguished Pennsylvania's unapportioned taxes from the "neutral user fees" of *Evansville. See id.* at 289–90, 107 *S.Ct.* at 2843–44, 97 *L.Ed.*2d at 246–48. The Court found that, unlike the $1 per trip fee in *Evansville,* the Pennsylvania taxes discriminated because the out-of-state vehicles were subject to much higher costs per mile traveled in the state, and the taxes did "not even purport to approximate fairly the cost or value of the use of Pennsylvania roads." *Id.* at 289–290, 107 *S.Ct.* at 2843–44, 97 *L.Ed.*2d at 247.

 Of course, the label used by the State for the exactions assessed has no effect on the result. The Supreme Court, for apparent ease of reference, tends to use the term "tax" to refer to an impost that is impermissible because it discriminates against or unduly burdens interstate commerce; and it tends to use the term "fee" for a charge that reflects—fairly, evenly, and sustainably—the States' police power interests and concerns. The critical question in all instances is whether the impact of a charge, as a matter of normative evaluation, is such that the impost can fairly be classified as a tax, *i.e.,* simply a revenue-raising measure; or as a "regulatory fee," *i.e.,* a reasonable charge designed with adequate care to require the payor to shoulder its fair share of support for state services or of the costs attributable to the regulated and regulatable activities. *See id.* at 282–83, 294, 107 *S.Ct.* at 2839–40, 2846, 97 *L.Ed.*2d at 242–43, 249–50.

We are mindful that in *Scheiner,* the Court evaluated flat per-axle fees, as well as marker fees, the proceeds of which were used to fund general highway maintenance and repairs. It held that unapportioned taxes or fees violate the Commerce Clause. The Court, however, has not specifically determined whether an unap-

portioned fee used exclusively to fund a regulatory safety and inspection program should be considered under the same standard.

Plaintiffs argue that there can be no distinction between types of imposts based upon their ultimate objectives. Plaintiffs contend that a flat fee unrelated to the level of use violates the Commerce Clause irrespective of the reason why it is imposed. Plaintiffs cite *Scheiner* as authority for this position:

Now that it has been firmly established that interstate commerce as such has no immunity from state taxation, it is no longer appropriate to uphold a flat tax merely because the particular formula by which its charges are reckoned extends the same nominal privilege to interstate commerce that it extends to in-state activities. Such formalism "merely obscures the question whether the tax produces a forbidden effect."

[*Id.* at 295–296, 107 *S.Ct.* at 2846–47, 97 *L.Ed.*2d at 250–51 (quoting *Complete Auto Transit, supra,* 430 *U.S.* at 288, 97 *S.Ct.* at 1083, 51 *L.Ed.*2d at 326).]

It is "the practical consequence of the tax" that controls; not the character of the privilege taxed. *Id.* at 294–95, 107 *S.Ct.* at 2846, 97 *L.Ed.*2d at 250.

*Scheiner* distinguished the Pennsylvania flat taxes from a severance tax based on the amount of coal consumed that was found constitutional in *Commonwealth Edison Co. v. Montana, supra,* 453 *U.S.* 609, 101 *S.Ct.* 2946, 69 *L.Ed.*2d 884. One distinction was that the amount of taxes did not "vary directly with miles traveled or with some other proxy for value obtained from the State." *Scheiner, supra,* at 291, 107 *S.Ct.* at 2844, 97 *L.Ed.*2d at 247. On this point, the Court adopted Justice Frankfurter's dissenting view in *Capitol Greyhound Lines v. Brice,* 339 *U.S.* 542, 557, 70 *S.Ct.* 806, 814, 94 *L.Ed.* 1053, 1062 (1950):

So long as a State bases its tax on a relevant measure of actual road use, obviously both interstate and intrastate carriers pay according to the facilities in fact provided by the State. But a tax levied for the privilege of using roads, and not their actual use, may, in the normal course of operations and not as a fanciful hypothesis, involve an undue burden on interstate carriers. While the privilege extended by a State is unlimited in form, and thus theoretically the same for all vehicles, whether interstate or intrastate, the intrastate vehicle can and will exercise the privilege whenever it is in operation, while the interstate vehicle must necessarily forego the privilege some of the time simply because of its interstate character, *i.e.,* because it operates in other States as well. In the general average

of instances, the privilege is not as valuable to the interstate as to the intrastate carrier.

Although *Scheiner* involved fees that were arguably revenue raising measures, three state court decisions have analyzed flat transporter fees not dissimilar from those involved here under the *Scheiner* standard for unapportioned taxes. In all three of those cases, the courts held the flat fees to be structurally unsound, *i.e.*, discriminatory, because they failed the internal consistency test. Those courts did not require the complaining party to submit specific proofs of actual discrimination. *See American Trucking Ass'ns, Inc. v. Secretary of State*, 595 *A.*2d 1014 (Me.1991); *American Trucking Ass'ns, Inc. v. Secretary of Administration*, 415 *Mass.* 337, 613 *N.E.*2d 95, 101 (1993); *American Trucking Ass'ns, Inc. v. State of Wisconsin, supra*, 205 *Wis.*2d 494, 556 *N.W.*2d 761.

The State argues that it is constitutionally significant whether a "flat fee" is a "regulatory user fee" or a revenue generating tax. The State argues that the transporter fees at issue here are regulatory user fees and should not be analyzed under the stricter internal consistency test of *Complete Auto Transit*, which it asserts is reserved for revenue raising taxes. The State characterizes the imposts as regulatory user fees imposed under the State's police power, incident to a transporter's voluntary request for the privilege to engage in the regulated activity of hazardous waste transport. *See National Cable Television Ass'n, Inc. v. United States*, 415 *U.S.* 336, 340–41, 94 *S.Ct.* 1146, 1149, 39 *L.Ed.*2d 370, 375 (1974). Accordingly, it contends that the public agency may exact a fee for supervising the activity that benefits the transporter.

The State contends that the *Evansville* test may be used to sustain a broader set of regulatory fees than the per-use fee involved in that case, and it likens the charges here to the user fees in *Evansville* by noting that, like the *Evansville* fees, the revenue collected is devoted to services that benefit only the group paying the fee. Plaintiffs concede, as determined by the Appellate Division, "that the fees are clearly not a form of hidden tax revenue production," 324 *N.J.Super.* at 10, 734 *A.*2d at 319, and

also "that the fees collected are approximate to and used for actual transporter program costs."

Nevertheless, any similarity that may exist between the fees here and those in *Evansville* is not dispositive. The critical feature that renders a "fee" a "user fee" entitled to *Evansville* analysis is that it is apportioned in some way demonstrably related to the use of or privilege to use the service or facility for the maintenance of which the fee is imposed.

The State also suggests that if we hold apportionment of the subject regulatory fees to be required, other fees, such as those for professional licensing, would be subject to attack on Commerce Clause grounds by out-of-state persons or entities who pursue their callings infrequently in New Jersey.

In *Franks and Son v. Washington, supra,* 136 *Wash.*2d 737, 966 *P.*2d 1232, *cert. denied,* 526 *U.S.* 1066, 119 *S.Ct.* 1458, 143 *L.Ed.*2d 544, (1999), the court upheld a gross weight regulatory fee on trucks, covering various services including safety inspections for vehicles. The lower court had held that plaintiffs had not shown the regulatory fee discriminated against interstate commerce, because the court saw no correlation between safety and inspection services and miles traveled. It nevertheless determined that the fee was impermissible under the Commerce Clause because it violated the internal-consistency/fair-apportionment prong of *Complete Auto Transit.*

The Supreme Court of Washington reversed, holding that the fee was a "regulatory fee" and not a tax, hence constitutional, because the record showed no direct evidence of discrimination and the internal consistency test was inapplicable. *Id.* at 1237. The court explained:

> The regulatory, police power of a state and its power to tax are treated differently for constitutional purposes.
>
> > "[T]he burden on interstate commerce involved in a direct tax upon it is inherently greater, certainly less uncertain in its consequences, than results from the usual police regulations." *Freeman [v. Hewit],* 329 *U.S.* [249, 253, 67 *S.Ct.* 274, 91 *L.Ed.* 265 (1946)]. Because "[t]he power to tax is a dominant power over commerce .... [a]ttempts at such taxation have always been more carefully

scrutinized and more consistently resisted than police power regulations of aspects of [interstate] commerce." *Id.*

[*Id.* at 1238.]

The court used a three-part test to determine whether a charge is a fee or a tax: first, whether the primary purpose of the assessment is to regulate or to generate revenue; second, whether the money collected is allocated only to the authorized regulatory purpose; and third, whether there is "a direct relationship between the fee charged and the services received by those who pay the fee or between the fee charged and the burden produced by the fee payer." *Id.* at 1239. Determining that the fee was adjustable to the cost of regulation, the court found that it was a "regulatory fee, not a flat tax." *Ibid.* In upholding the fee, the court applied the less stringent "undue burden" test of *Pike v. Bruce Church, Inc., supra,* 397 *U.S.* at 142, 90 *S.Ct.* at 847, 25 *L.Ed.*2d at 178, without expressly articulating why it applied that test. The *Pike* test, however, is reserved for state regulations that do not patently discriminate against interstate commerce. *See Camps, supra,* 520 *U.S.* at 583 n. 16, 117 *S.Ct.* at 1602 n. 16, 137 *L.Ed.*2d at 869 n. 16.

The United States Court of Appeals had used similar reasoning in applying the *Pike* undue burden test to uphold a flat licensing fee. *See V-1 Oil Company v. Utah State Department of Public Safety,* 131 *F.*3d 1415, 1422–23 (10th Cir.1997). Pursuant to a its statute providing a system of safety regulations for the liquefied petroleum gas (LPG) industry, Utah enacted a licensure requirement for anyone who sold, transported, dispensed, or stored LPG in that state. *Id.* at 1418. The Plaintiff was the owner and operator of four LPG facilities within Utah and two facilities in other states. It sued because the State had compelled it to pay the $225.00 fee for the out-of-state facilities that served residential customers in Utah.

The Circuit Court rejected the idea that the licensing fees were taxes:

We believe that there is considerably more to the police-power-based-regulatory-fee-versus-tax dichotomy than the parties have maintained. While a regulatory

police power fee that is reasonable in relationship to its costs is almost always sustained, *see Aldens, Inc. v. LaFollette*, 552 *F*.2d 745, 749–50 (7th Cir.1977), a tax with effects upon interstate commerce is "more carefully scrutinized and more consistently resisted . . . ." *Freeman v. Hewit*, 329 *U.S.* 249, 253, 67 *S.Ct.* 274, 276, 91 *L.Ed.* 265 (1946). *See also Pike v. Bruce Church, Inc.*, 397 *U.S.* 137, 142, 90 *S.Ct.* 844, 847, 25 *L.Ed.*2d 174 (1970) (outlining balancing test for a nondiscriminatory regulation).

[*Id.* at 1422.]

The court analyzed Utah law for its distinction between licensing fees and taxes, and held that "the assessments involved here cannot be characterized as use or excise taxes, but rather as an unadorned *fee* assessed to help defray the costs of inspecting LPG facilities and to ensure that all LPG handlers providing LPG services within the State of Utah meet minimum standards of safety." *Id.* at 1423.

The court then analyzed the licensing fee under the *Pike* three-factor test: "1) whether there is the furtherance of a legitimate local public interest; 2) whether the statute regulates evenhandedly; and 3) whether the statute places an undue burden on interstate commerce." *Id.* at 1424. It viewed regulation of hazardous materials as clearly a matter of legitimate local public interest, *ibid.*, and determined that the State imposts regulated evenhandedly because the fees were imposed on in-state and out-of-state facilities in the same amounts. *Id.* at 1424–25. The court distinguished *Scheiner* by suggesting that while Pennsylvania's tax on all truckers had created a financial barrier to the free movement of commerce, the Utah regulation did not affect all commercial trucks but only regulated what the State "reasonably thinks is a potentially dangerous or troublesome activity carried on within its borders." *Id.* at 1425. The court determined that interstate commerce was not unduly burdened because any burdens that existed were "purely incidental." *Id.* at 1427.

 Based upon a fair reading of *Scheiner* and a straightforward application of the principles informing it, we reject the State's arguments and respectfully disagree with the rationales employed in *Franks and Son* and *V–1 Oil.* We are in essential agreement with Judge Small's determinations for the reasons he

stated, that plaintiffs have made a sufficient *prima facie* showing of discrimination against interstate commerce to shift the burden to the State to show that the impositions pass constitutional muster. Plaintiffs have demonstrated that the fee mechanism at issue is structurally discriminatory, and they should not be compelled to prove the precise level of the per-activity cost disparity. As the Court noted in *Chemical Waste Mgmt., Inc. v. Hunt*, 504 *U.S.* 334, 342, 112 *S.Ct.* 2009, 2014, 119 *L.Ed.*2d 121, 132 (1992), "once a state tax is found to discriminate against out-of-state commerce, it is typically struck down without further inquiry." *See also Associated Industries of Missouri v. Lohman*, 511 *U.S.* 641, 650, 114 *S.Ct.* 1815, 1822, 128 *L.Ed.*2d 639, 648–49 (1994); *Maryland v. Louisiana*, 451 *U.S.* 725, 760, 101 *S.Ct.* 2114, 2136, 68 *L.Ed.*2d 576, 604 (1981); *Oregon Waste Systems, Inc. v. Department of Env. Quality*, 511 *U.S.* 93, 100, 114 *S.Ct.* 1345, 1350, 128 *L.Ed.*2d 13, 22 (1994).

■ We also agree that, on the record developed, the State has not met its burden to establish that Commerce Clause standards have not been violated. No minimally persuasive showing has been made that the fees are adequately apportioned in a way that bears a sufficiently clear and direct relationship to State services rendered to those subject to the charges. Thus, the hazardous waste transporter registration fees as currently framed may not be validly applied to plaintiffs and other interstate transporters.

■ We reject the State's contention that as long as a "flat fee" is a "regulatory user fee," it is not subject to the four-prong test of *Complete Auto Transit.* Such a view ignores the underlying rationale of *Scheiner* that it is the practical effect of the charge that controls, not its formal language or purported structure. *Scheiner, supra,* 483 *U.S.* at 294–95, 107 *S.Ct.* at 2846, 97 *L.Ed.*2d at 250. The State has failed to demonstrate that the charges at issue are different in practical effect than those invalidated in *Scheiner* because "[t]hey discriminate[d] against out-of-state vehicles by subjecting them to a much higher charge per mile traveled in the State, and they [did] not even purport to approximate fairly

the cost or value of the use of Pennsylvania's roads." *Id.* at 290, 107 *S.Ct.* at 2844, 97 *L.Ed.*2d at 247.

The State has provided no basis in principle and reason, as distinguished from form, for applying the *Evansville* standard and the *Pike* rationale. The only similarity the State offers between the fees here and those in *Evansville* is that both are nominally used to fund regulatory programs and are not general revenue raising measures, as the State proposes was so in *Scheiner.* However, the "user fees" found sustainable under the Commerce Clause in *Evansville* and *Northwest Airlines Inc. v. County of Kent* shared a critical characteristic that the New Jersey fees lack; they were related to the payors' levels of use of the facilities or services the fees were enacted to sustain. In *Evansville, supra,* the state charged passengers $1 on a per-trip basis that went to covering the costs of airport construction and maintenance. 405 *U.S.* at 709, 92 *S.Ct.* at 1351, 31 *L.Ed.*2d at 624–25. In *Northwest, supra,* each airline was charged a fee in proportion to its use of the airfield to defray costs for maintenance of the airfield. 510 *U.S.* at 359, 114 *S.Ct.* at 859, 127 *L.Ed.*2d at 190.

Attributing to plaintiffs' *prima facie* showing the burden-shifting effects allowed by Judge Small, we conclude that the State has failed to prove the validity of the charges at issue here. The transporter fees fail the internal consistency test; they discriminate against interstate commerce; and they impose an undue burden on interstate commerce. The transporter fees threaten "the free movement of commerce by placing a financial barrier" around the State of New Jersey. *See Scheiner, supra,* 483 *U.S.* at 284, 107 *S.Ct.* at 2840, 97 *L.Ed.*2d at 243.

The fees at issue do not survive two of the four tests required by *Complete Auto Transit v. Brady, supra,* 430 *U.S.* 274, 97 *S.Ct.* 1076, 51 *L.Ed.*2d 326. The fees are not fairly apportioned—the same fee is imposed on each vehicle delivering or picking up hazardous waste in New Jersey, regardless of the number of trips the vehicle makes. The State argues that that impact is mitigated because no other state could charge a fee for regulating collection

or delivery of hazardous waste in New Jersey. Hence, the State contends, the transporter registration fees cannot fail a fair internal consistency test.

The answer is clear, however. Even though the fees at issue may be targeted appropriately, *i.e.*, they are imposed on "delivery or collection" not merely on transport of hazardous waste through the State, the fact remains that, among businesses similarly engaged, out-of-state truckers will pay a distinctly higher cost per activity on average than in-state truckers will pay. Given that flat charges are involved, the key is the frequency with which New Jersey-based operations conduct their activities in this State as compared to non-New Jersey entities.

The State has failed to show that the apparent discrimination engendered by the fees is not real in fact. Plaintiffs, on the other hand, have made a *prima facie* showing that the fees discriminate in practical effect. Plaintiffs have shown that, based on several measures, out-of-state truckers pay between twice as much and almost three times as much as in-state truckers pay. The State has presented little by way of affirmative proof, and its efforts to discredit plaintiffs' showings have been to no avail. Its critiques of plaintiffs' methodology regarding the eighty-percent/twenty-percent paradigm to distinguish the activities of out-of-state truckers from those operating in-state, and the use of fees per manifest as a basis of comparison, do not go far enough to defeat the entirety of plaintiffs' analysis, which is also based on cost-per-ton for all companies, and shows that non-New Jersey companies paid between 1.9 and 2.6 times more than New Jersey companies did between 1994 and 2000.

Another critique offered by the State is that plaintiffs' aggregate-level analysis masked data showing that individual out-of-state companies had lower costs per manifest or costs per tonnage than NJ companies experienced. As *Scheiner* clearly indicates, however, the discriminatory effect of a fee can only be conducted based on averages. The Court explained that since intrastate carriers always use the state's roads, they are the primary benefi-

ciaries of a flat tax and " 'in the general average of instances, the privilege is not as valuable to the interstate as to the intrastate carrier.' " *Scheiner, supra,* 483 *U.S.* at 291, 107 *S.Ct.* at 2844, 97 *L.Ed.*2d at 248 (quoting Frankfurter, J., dissenting in *Capitol Greyhound, supra,* 339 *U.S.* at 557, 70 *S.Ct.* at 814, 94 *L.Ed.* at 1053). The Court also explained:

> Nor is the axle tax saved because some out-of-state carriers which accrue high mileage in Pennsylvania pay the axle tax at a lower per-mile rate than some Pennsylvania-based carriers; it makes no difference that the axle tax, on its face, does not exact a lower per-mile charge from Pennsylvania-based carriers than from out-of-state carriers. Like the exemption from wholesaling tax for goods manufactured in Washington that we struck down in *Tyler Pipe Industries, Inc. [v. Washington Dept. of Revenue,* 483 *U.S.* 232, 107 *S.Ct.* 2810, 97 *L.Ed.*2d 199 (1987)], the axle tax has a forbidden impact on interstate commerce because it exerts an inexorable hydraulic pressure on interstate businesses to ply their trade within the State that enacted the measure rather than "among the several States."
>
> [*Id.* at 286–87, 107 *S.Ct.* at 2842, 97 *L.Ed.*2d at 245.]

Throughout the history of this case, the State has also argued that measures of the effects of the fees, such as the cost "per manifest" or "per ton" for out-of-state transporters compared to New Jersey operations, are meaningless because tonnage and manifests are primarily influenced by non-fee factors such as proximity to generators or disposal sites, fleet size, common ownership with other hazardous waste businesses, safety records and the like. The State has argued that plaintiffs should have used an econometric model to control for the impact of those external factors on the differences between in-state and out-of-state tonnage or number of manifests, and that if they had done so, the independent impact of the fee on tonnage or manifests would be insignificant.

We reject that argument as well, because it is based on a faulty premise. Plaintiffs are not claiming that the fees are the cause of their "transporter performance" *i.e.,* the tonnage hauled or the number of manifests per company, but rather that, given their transporter performance as determined by all pertinent factors, it is inequitable that they pay significantly more per ton or per manifest than firms with vehicles largely registered in New Jersey. The reasoning in *Scheiner* takes as a given that such

differential factors exist: "the very nature of the market that interstate operators serve prevents them from making full use of the privilege of doing business for which they have paid the State." *Scheiner, supra,* 483 *U.S.* at 284 n. 16, 107 *S.Ct.* at 2840 n. 16, 97 *L.Ed.*2d at 243 n. 16.

Finally, the State has relied on its own market share analysis between 1993 and 2000 to establish the absence of a discriminatory impact. Its showing is flawed because, without a pre-post analysis, the stable market share trends reported cannot be taken to suggest a lack of discriminatory effect. Plaintiffs' economist testified that it is quite likely a leveling off of exclusionary impact may have occurred by 1993 when the data was first collected.

██ The fees also impose an undue burden on interstate commerce. As the Court in *Scheiner* explained, " '[w]hen the measure of a tax bears no relationship to the taxpayers' presence or activities in a State, a court may properly conclude under the fourth prong of the *Complete Auto Transit* test that the State is imposing an undue burden on interstate commerce.' " *Id.* at 291, 107 *S.Ct.* at 2844, 97 *L.Ed.*2d at 247–48 (quoting *Commonwealth Edison Co. v. Montana, supra,* 453 *U.S.* at 629, 101 *S.Ct.* at 2959, 69 *L.Ed.*2d at 902). Clearly, here, the unapportioned fees are unrelated to activity in the State, and, hence, pose an undue burden on commerce.

In summary, we hold, based upon the record that has been developed, that the transporter fee mechanism lacks internal consistency; it discriminates against interstate commerce by charging a flat fee unrelated to a transporter's level of activity in the State; and it places an undue burden on interstate commerce.

The Court in *Scheiner* explained that an unapportioned tax may survive, even if it fails the tests of *Complete Auto Transit,* if it is "the only practicable means of collecting revenues from users and the use of a more finely gradated user-fee schedule would pose genuine administrative burdens." *Scheiner, supra,* 483 *U.S.* at 296, 107 *S.Ct.* at 2847, 97 *L.Ed.*2d at 251. The State, in an effort

to distinguish the facts of *Scheiner* and, thus, avoid its impact, argues that the transporter fees are assessed for services that are unrelated to mileage. The State also claims the fee has no relationship to manifests or tonnage. We reject those contentions as well. While any given activity may be unrelated to tonnage or the number of manifests of a particular transporter, on average transporters with more mileage, manifests, and tonnage will receive more services. *Cf. American Trucking Ass'ns, Inc. v. Secretary of State*, 595 A.2d 1014, 1017 (Me.1991) (observing that "considering the actuarial considerations any state must take into account in preparing itself for emergencies, we find counter-intuitive the State's argument that it does not take miles traveled, and thus time on the roads, into consideration in determining the required amount of preparedness").

We discern no compelling need to structure the New Jersey transporter registration fees on an unapportioned basis. The State could apportion a transporter fee based on several measures of activity including manifests, mileage or tonnage hauled. Its argument that apportionment based on some measure of activity is impracticable lacks power, for it appears that it is based only on relating the cost of the fee to the level of services actually provided. This is not the only basis that might be employed, however. An apportionment based on tonnage hauled or mileage would be a link to the level of activity that might render the fee constitutional. The State has not established the impracticability of implementing a fee with such a potentially permissible basis. Therefore, it cannot be heard to assert the argument it makes. *See American Trucking Ass'ns v. Wisconsin, supra*, 556 N.W.2d at 768 (ruling that the State "cannot justify imposing a flat unapportioned fee solely because it had not made the studies necessary to structure a constitutionally apportioned fee").

## VII.

For the reasons we have stated, we hold the hazardous waste transporter registration fee mechanism embodied in *N.J.S.A.*

13:1E–18, as implemented by *N.J.A.C.* 7:26G–3.3(g) and applied to plaintiffs and others similarly situated, to be in violation of Commerce Clause standards. We reverse the Appellate Division's judgment of June 15, 1999, reinstate the Tax Court's March 23, 1998 grant of partial summary judgment to plaintiffs and its denial of the State's cross-motion for summary judgment, and remand to the Tax Court for such further proceedings on the reserved issues as may be necessary to conclude the matter.

*For reversal and remandment*—Chief Justice PORITZ and Justices VERNIERO, ZAZZALI, ALBIN, WALLACE, and KESTIN (temporarily assigned)—6.

*Opposed*—None.