NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

## TAX COURT OF NEW JERSEY



**Mala Sundar**
 **JUDGE**

R.J. Hughes Justice Complex
 P.O. Box 975
25 Market Street
Trenton, New Jersey 08625
Telephone (609) 815-2922
TeleFax: (609) 376-3018
taxcourttrenton2@judiciary.state.nj.us

December 7, 2018

Kyle O. Sollie, Esq.
Jonathan E. Maddison, Esq.
Reed Smith L.L.P.

Michael J. Duffy, Esq.
Deputy Attorney General

Re: Ferrellgas Partners, L.P. v. Director, Division of Taxation
Docket No. 007051-2014

Dear Counsel:

This opinion decides each party's partial summary judgment motion in the above-captioned matter. Plaintiff contends that N.J.S.A. 54A:8-6(b)(2) (the "Challenged Statute"), which requires any partnership having New Jersey source income to pay a per-partner fee of $150 (capped at $250,000) when filing its information return, violates the Dormant Commerce Clause ("DCC") because it is a flat tax, and that defendant's regulations apportioning the same, while valid, are unworkable as applied to plaintiff.

Defendant claims that the levy is a fee to defray governmental costs of reviewing and processing information returns of partnerships, and thus must be upheld unless the levy amount is proven to egregiously exceed costs. Alternatively, defendant argues, the Challenged Statute does not violate the DCC, especially since its regulations provide an apportionment for non-resident, no-physical nexus partners.

*

The court is unpersuaded that any levy, whether a fee or a tax, is automatically or per se unconstitutional under the DCC solely because it is a flat amount and the payor of the levy is involved in interstate commerce. Rather, the court must examine the nature of the interstate commerce claimed to be negatively treated by New Jersey, the nature of the activity that the State law is regulating or expensing, and whether the regulated activity or expensing by the State law discriminates against the identified interstate commerce.

As explained below, the court finds that pursuant to the plain language and legislative history of the Challenged Statute, the partnership filing fee (hereinafter "PFF") is imposed as costs for the governmental activity of processing/reviewing returns of partnerships and their partners filed in New Jersey so as to track their New Jersey source income. This is a purely intrastate activity. As such, the Challenged Statute does not implicate the DCC, and is not susceptible to being invalidated under the DCC simply because plaintiff is presumably involved in interstate commerce -- its investment activity in partnerships. Thus, defendant's partial summary judgment motion is granted in this aspect only.

Plaintiff is also not entitled to partial summary judgment because (1) the Challenged Statute is not facially discriminatory: all partnerships or entities treated as such, must pay the PFF regardless of the location of the partnership or partner, or the nature of the partnerships' business, provided the entity earns New Jersey sourced income; and (2) plaintiff has not provided even a prima facie showing that the PFF, in practical effect, discriminates against interstate commerce, i.e., its investment activity. Merely relying on the computation of an identical amount multiplied by 50 States under the hypothetical formulation of the internal consistency test does not satisfy plaintiff's burden of initially proving a disparate impact of the PFF upon interstate commerce. That defendant promulgated regulations apportioning the fee based solely on the lack of physical

nexus of a nonresident partner does not require a conclusion that the Challenged Statute violates the DCC. Indeed, the regulations are an invalid exercise since they exceed the scope of the Challenged Statute by apportioning the fee.

Finally, both parties are not entitled to partial summary judgment if the PFF was viewed as having an incidental but not disparate impact on plaintiff's investment activity, and the court were to engage in a cost-benefit analysis for purposes of the DCC to determine if the PFF excessively burdens interstate commerce. Plaintiff has not proven excessive burden, and defendant has not proven the PFF is not excessive.

## BACKGROUND

*(I) The Challenged Statute and Regulations*

Under the Gross Income Tax ("GIT") Act, an entity classified as a partnership for federal income tax purposes is required to file an informational return showing all items of income and loss if the entity has "a resident owner" or has "any income derived from New Jersey sources." N.J.S.A. 54A:8-6(b)(1). The return must include the "name and address of each partner, member, or other owner of an interest in the entity however designated." Ibid. A copy of the informational return must be provided to each partner or owner. N.J.S.A. 54A:8-6(b)(3).

In 2002, New Jersey enacted the Business Tax Reform Act ("BTRA"), L. 2002, c. 40, to attempt a cure to the "core problems" of large and multi-national corporations earning billions in New Jersey source income but paying only a minimum tax. Statement to A. 2501 51 (June 6, 2002). This was to be accomplished by, among others, "establish[ing] a revenue stream that captures enforcement and processing costs that New Jersey incurs from processing the vast

network of limited liability companies and partnerships." Id. at 52.[1] See also Assembly Budget Comm. Statement to A. 2501 1 (June 27, 2002) (the BTRA was "intended to reform New Jersey's system of taxation of corporations and other business entities," thus, among others, "affects the tracking of the income of business organizations, like partnerships, that do not themselves pay taxes but that distribute income to their owners, the eventual taxpayers.").

To this end, the BTRA proposed several amendments to the Corporation Business Tax ("CBT") Act and the GIT Act. One proposal was to impose a filing fee under the GIT Act upon partnerships, including entities classified as a partnership under the federal income tax statute such as limited liabilities companies ("LLCs"), at $150 per owner, capped at $250,000. A. 2501 (June 6, 2002). It was subsequently amended to "[c]larify that the partnership fees apply only to partnerships that derive income from New Jersey." See Assembly Budget Comm. Statement to A. 2501 13; A. 2501 (June 28, 2002).

The "per-owner processing fee," was imposed "on the owners of pass-through entities," which "are not subject to tax themselves, but 'pass-through' their income to their owners . . . who are subject [to tax] in their separate capacities." Assembly Budget Comm. Statement to A. 2501 7. "For pass-through entities that have income from New Jersey sources and more than two members, the bill establishes an annual $150 per owner filing fee, capped at $250,000 per entity annually." Ibid. "One of the key objectives" of the BTRA "was to reach pass-through business entities that profited economically from their presence in New Jersey, yet paid nothing in taxes to the State," and that the "processing fee was intended to compensate the State for the large volume

_____

[1] The other two measures were the closure of "loopholes" that allowed an artificial reduction of income, thus, payment of little to no CBT, and to impose an alternative minimum assessment. However, small businesses were provided additional incentives by reducing the tax rate, and expanding certain credits. Statement to A. 2501 51-52.

of return processing and compliance enforcement from" such entities.  Press Release, Office of the State Treasurer, Partnership Fee Waived for Investment Clubs Below $60,000 (Nov. 26, 2002). However, the fee was not intended for "[f]riends and neighbors who pool their money for . . . investment growth," or for "small investment clubs with limited shared capital assets," since these clubs were not pass-through entities "as envisioned in the" BTRA, and do not "do business like large pass-through entities."  Id.

The fiscal analysis of the BTRA bill estimated the "fiscal impact," i.e. the "[i]ncrease in General Fund revenue," as generating several million dollars for fiscal years ("FY") ending 2003-2005, and tabulated the "Revenue Increase in $Millions" from the "partnership processing fee" as estimated by the Office of Legislative Services ("OLS") to be between $40-$60 million for FY 2003; and $28-$40 million for FYs 2004 and 2005.  Legislative Fiscal Estimate to A. 2501 2 (September 13, 2002).  This document noted that "[w]hile no formal analysis was provided by the Executive Branch," the Treasurer had provided revenue estimates, which for the "partnership processing fee" was between $50-$80 million for FY 2003.  Ibid.  The document also noted that the "OLS estimates do not account for behavioral changes" after the law would be enacted, such as dissolution, change in status, relocation, change in business or accounting practices.  Ibid. Further, the "administration projection" of the partnership processing fee was "based on data currently collected by the Division of Taxation," from which it was not possible to "determine . . . precisely which of the partnerships would be excluded from the payment of this fee."  Id. at 3. Thus, the OLS provided a "more conservative estimate" of the "partnership processing fee."  Ibid.

N.J.S.A. 54A:8-6 was thus amended to include new subsection (b)(2), the Challenged Statute, as follows:

5

> Each entity classified as a partnership for federal income tax purposes, other than an investment club, having any income derived from New Jersey sources, including but not limited to a partnership, a limited liability partnership, or a limited liability company, that has more than two owners shall at the prescribed time for making the return required under this subsection make a payment of a filing fee of $150 for each owner of an interest in the entity, up to a maximum of $250,000.
>
> [N.J.S.A. 54A:8-6(b)(2)(A).][2]

A partnership must make an installment payment of the filing fee for the succeeding tax year at 50% of the fee paid for the current tax year. N.J.S.A. 54A:8-6(b)(2)(B). This installment will be used as a credit for the succeeding year's fee, and to the extent it exceeds the fee actually due, will be credited to future years. Ibid. For purposes of administration and collection, including the imposition of interest and penalties, the fee is governed by the State Tax Uniform Procedure Law ("STUPL"). N.J.S.A. 54A:8-6(b)(2)(C).[3]

In 2003, defendant ("Taxation"), while promulgating regulations to implement the PFF, observed:

---

[2] An identical proposal was made for a professional corporation ("PC"). See Assembly Budget Comm. Statement to A. 2501 at 7 (". . . similar filing fee per licensed professional for [PCs] with more than two licensed professionals" was imposed by the BTRA). Thus, a domestic PC or foreign for-profit entity which renders "professional services," with "more than two professionals," must pay a filing fee of $150 "for each licensed professional," maxed at $250,000. N.J.S.A. 54:10A-18(c)(2). However, this statute does not condition the fee on having New Jersey source income unlike the per-partner fee in N.J.S.A. 54A:8-6(b)(2)(A). Note that PCs are not pass-through entities, thus, must file CBT returns.

[3] The statute provides that "[n]otwithstanding" N.J.S.A 54:48-2 and 48-4, the "per-partner fee . . . and the installment payment . . . shall, for purposes of administration, be payments to which the provisions of" STUPL apply, as well as for the enforcement of "collection" of such fee. N.J.S.A. 54A:8-6(c). N.J.S.A. 54:48-2 defines "State tax" as a levy "payable to or collectible by . . . Taxation" and "State tax law" to mean one which "imposes or levies" such a tax. N.J.S.A. 54:48-4 provides that the collection of any State tax is enforceable under the STUPL, unless specifically prohibited by a State tax law which imposes such a tax. The STUPL provisions are similarly applicable to the $150 per-professional fee imposed on PCs. See N.J.S.A. 54:10A-18(c)(4).

> The social impact of the BTRA and the rules and amendments implementing it will be a step in the direction of restoring an even playing field to the taxation of business enterprises in New Jersey. Good tax policy should result in similarly situated or comparable taxpayers paying a comparable tax. It should not reward taxpayers simply because they are capable of structuring their enterprises in a particular fashion.
>
> In implementing the statute by the rules and amendments [Taxation] . . . has exercised . . . discretion in a variety of ways intended to increase the equitable treatment of similarly situated taxpayers. These include . . . providing an apportionment methodology for partnerships and [PCs] liable for the partnership fee or the [PC] fee that have partners or professionals that never enter New Jersey.
>
> [35 N.J.R. 1573(a) (April 7, 2003).][4]

Thus, while the proposed regulations implemented the statutory requirement for the fee, and the amount payable by a partnership, it also proposed "an apportionment methodology" if (1) the partnership included nonresident partners, some with "physical nexus" to New Jersey, and some without such nexus; and (2) the partnership has an office outside New Jersey. See 35 N.J.R. 1573(a) (April 7, 2003). "Apportionment" of the PFF would effectively "decreas[e] the liability for partnerships whose direct physical connection with New Jersey is remote." Ibid. However, because the apportionment computation uses the CBT allocation factor, "adjustment of the factor may be sought in instances that its application produces a distortion, such as instances where there is no property or payroll, for example." Ibid.

Following the proposal, Taxation received a comment inquiring as to "why the filing fee is not apportioned for professionals/partners with nexus." See 35 N.J.R. 4310(a) (Sep. 15, 2003) (emphasis added). To this query, Taxation responded that due to "the absence of legislative

---

[4] Taxation noted that investment clubs were exempt from the fee as it would unduly burden "small investments clubs" which were estimated to be around 1400-1500 in number, with "11 members" and "an average asset base of $63,000." 35 N.J.R. 1573(a).

guidance on the issue of apportioning the fee," Taxation had determined that "at this time only partners or professionals without nexus would be subject to apportionment." Ibid.

The regulations thus provide that the PFF can be apportioned if a partnership has an office outside this State, and nonresident partners with no physical nexus here. N.J.A.C. 18:35-11.2(b). The computation is as follows:

> The total apportioned partnership fee is equal to the sum of:
> 1. The number of resident partners multiplied by $ 150.00; plus
> 2. The number of nonresident partners with physical nexus to New Jersey multiplied by $ 150.00; plus
> 3. The number of nonresident partners without physical nexus to New Jersey multiplied by $ 150.00 and the resulting product multiplied by the corporate allocation factor of the partnership.
>
> [N.J.A.C. 18:35-11.2(c).]

The allocation factor to be used is that of the partnership, which when promulgated in 2003 was the "property, payroll and double weighted receipts fractions," and was amended to "the single receipts fraction" in 2016 due to a change in the CBT law in this regard. See 47 N.J.R. 2445(a) (Oct. 15, 2015); N.J.A.C. 18:35-11.2(c)(i).

Examples of the computation are as follows: If a partnership had all resident partners, the fee is $150 times the number of partners. N.J.A.C. 18:35-11.6, Ex. 1. If a Connecticut partnership, which had an office in Connecticut and New Jersey, and New Jersey source income, had 4 partners with no physical nexus to New Jersey, and the partnership's allocation factor was 0.4, the fee would apportioned by multiplying 4 x $150 x 0.4 or $240. Id., Ex. 2. If a limited partner of a New Jersey partnership was a California limited partnership which stored property in the New Jersey partnership's office, had an allocation factor of 10%, and received $1 million in distribution from the New Jersey partnership, then the California limited partner would also be liable, as a partnership, for the fee because it has New Jersey source income. Id., Ex. 3. Assuming all 15

partners of the California limited partnership had no physical nexus to New Jersey, the fee would be 15 x $150 x 0.1 or $225.  Ibid.

Taxation also issued a Technical Bulletin explaining the "Partnership Filing Fee."  See TB-55 (April 6, 2005).  It set forth the liability for the fee (partnerships with "3 or more owners and New Jersey source income or loss"), the amount of the fee ($150 per owner capped at $250,000 and "generally determined by the number of K-1s filed by . . . the partnership, including when a . . . tiered partnership or pass-through entity is involved"), and the due date of filing/payment.  Id. Taxation noted that as to "tiered partnerships, each partnership pays the filing fee required for its partners."  Ibid.  Taxation also noted that "[s]ince one purpose of the filing fee is to cover processing costs, there is no exemption or proration of the fee" for part-year owners/partners or partnerships which were created mid-year.  Ibid.  As to nonresident partners, Taxation stated, "[i]f the partnership has income earned outside New Jersey, the filing fee for nonresident partners that do not have physical nexus with New Jersey may be apportioned based on New Jersey source income," determined with reference to the corporate allocation factor.  Id. at 2.  Among the exceptions to the fee was a partnership that had "all operations and facilities . . . located outside New Jersey."  Ibid.  An expense sourced to New Jersey invited the fee, such as property taxes on "'raw' land in New Jersey," but not fees on a "New Jersey checking account" or paid to a New Jersey "accounting firm," or paid for filing annual reports.  Ibid.  The Bulletin also separately outlined the requirements for a partnership to pay a tax on behalf of its nonresident partners and the respective GIT and CBT rates.  Ibid.  It noted that "[i]ncome cannot be allocated outside New Jersey (all income is New Jersey source income) if the partnership has no place of business outside New Jersey."  Ibid.

The Bulletin was then twice revised. See TB-55(R) issued April 3, 2009, and July 13, 2016. The April 2009 Bulletin was almost identical to the one issued in 2005. The July 2016 Bulletin corrected the numbers of partners required for the fee to be imposed to two or more, and noted that the fee applied if the partnership has New Jersey sourced income or loss or "any type of New Jersey resident partner."[5] It also added that late payment of the fee will invite penalties and interest, and that Taxation has three years under the GIT Act to assess such fees. See N.J.S.A. 54A:9-4. The remainder of the bulletin was almost similar to the one issued in 2009, except that it did not mention that one purpose of the fee is to cover processing costs.

*(II) Facts*

Plaintiff ("FGP") is a publicly traded limited partnership incorporated in Delaware, and listed on the New York Stock Exchange. It is headquartered and commercially domiciled in Kansas. Partnership interests in FGP are represented by "units" which are regularly traded on the stock exchange market. FGP's 1% general partner is Ferrellgas Inc., a wholly owned subsidiary of Ferrell Companies, Inc. Per its New Jersey partnership returns ("NJ-1065"), FGP's limited partners are (1) the public "shareholders," (2) Ferrell Companies, Inc., (3) Ferrell Companies, Inc. dba Ferrell Propane Inc., and (4) Jef Capital Management, Inc.

---

[5] See also Division of Taxation, Tax Topic Bulletin GIT-9P Income from Partnerships, 4 (rev'd. 12/17) (an entity classified as a partnership federally "[h]aving any income or loss derived from New Jersey sources that has more than two owners may be required to make a payment of $150 for each owner of an interest in the entity, up to a maximum of $250,000."); Taxation's electronic Notice as to Partnership Filing Requirements (last updated June 5, 2018) that "[p]artners having both general and limited partnership interest shall be counted twice when determining the total partnership fee owed;" as to "[t]iered partnerships - each partnership pays the filing fees required for its partners;" and that "Schedule J" of Form 1065 "must be completed to claim an apportioned filing fee." (Available at https://www.state.nj.us/treasury/taxation/partnotice.shtml) (last accessed Sep. 11, 2018).

For tax year 2009, FGP had 67,019 partners of which 2,542 were residents or partners with nexus to New Jersey. For tax year 2010, of the 66,835 partners, 2,423 were residents or partners with nexus to New Jersey. For tax year 2011, of the 82,047 partners, 2,927 were residents or partners with nexus to New Jersey.

FGP is the 99% sole limited partner in an affiliated limited partnership Ferrellgas, L.P., a Delaware limited partnership (hereinafter the "Operating Partnership"). The Operating Partnership's 1% general partner is Ferrellgas Inc. (which is also the general partner of FGP).[6] FGP, as limited partner, facilitates investments by the investing public in the Operating Partnership. The Operating Partnership distributes propane on a nation-wide basis (popularly known as "Blue Rhino" propane tanks, which can be purchased at third-party retail stores). It has a storage facility in New Jersey, and three other locations to handle service/delivery calls.

For the tax years at issue, the Operating Partnership filed its NJ-1065s. On Schedule J, Allocation Schedule, FGP reported as allocable to New Jersey: (1) property (real and intangible) valued at $11,499,191; receipts of $20,380,367; payroll of $3,434,904, and a total apportionment of 1.1680% for tax year 2009; (2) property (real and intangible) valued at $11,418,129; receipts of $19,077,148; payroll of $3,229,104; and a total apportionment of 1.0550% for tax year 2010; and, (3) property (real and intangible) valued at $11,510,505; receipts of $21,519,209; payroll of $2,887,867; and a total apportionment of 1.0161% for tax year 2011. Note that it used the same

_____

[6] Both Ferrellgas Inc. and Ferrell Companies, Inc. are wholly owned by a leveraged employee stock ownership trust set up under the Ferrell Companies Employee Stock Ownership Plan so that employees of Ferrellgas Inc. can own stock in these corporate entities, and indirectly in FGP and the Operating Partnership.

allocation factor as the Operating Partnership. FGP also reported New Jersey sourced net partnership income of $942,513; $597,413; and $190,966 for each tax year 2009 to 2011.[7]

*(III) Procedural History*

For each tax year, FGP paid Taxation $250,000, the maximum amount of the filing fee. It then claimed a refund on grounds its distributive share of partnership income from the Operating Partnership was not reportable income pursuant to BIS LP Inc. v. Dir., Div. of Taxation, 25 N.J. Tax 88 (Tax 2009), aff'd, 26 N.J. Tax 489 (App. Div. 2011). It also filed amended NJ-1065s zeroing out the New Jersey source income it had previously reported.

Taxation administratively denied the refund claims. It noted that pursuant to N.J.A.C. 18:35-1.3(d)(6), a tiered partnership must "take into account its distributive share of partnership income" and cannot thereafter "reallocate[]" the same. Therefore, and since the Operating Partnership had allocated income to New Jersey, FGP could not reallocate it. Taxation then issued final determinations in this regard for each tax year.

FGP filed a timely complaint, and then moved for partial summary judgment claiming that the fee is a tax, and violated the DCC under three of the four criteria enunciated in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274 (1977), because the fee discriminated against interstate commerce, was not fairly apportioned, and was not fairly related to the services provided by New

---

[7] The distributive share of New Jersey source partnership income from the Operating Partnership was $1,208,149; $898,503; and $477,459 for each tax year 2009-2011. These were offset with FGP's ordinary losses from trade or business of -$265,636; -$300,640; and -$286,493 for each respective tax year. Note that the reported distributive share of New Jersey source partnership income differed from that on the K-1s issued to FGP by the Operating Partnership for each tax year, which was $1,222,097; $907,482; and, $484,201.

Jersey.[8]  FGP also provided the following data obtained from the Department of Treasury pursuant to its request under the Open Public Records Act ("OPRA"):

(1) The New Jersey source income reported by all partnerships for tax years 2009-2011 was $26,400,624,146; $42,211,064,190; and $11,679,724,687 respectively.

(2) The partnership filing fees received from all entities in tax years 2009-2011 totaled $44,703,658; $47,109,396; and $47,461,768 respectively.

(3) The salaries paid to all employees of the Division of Revenue who worked on processing GIT returns for FYEs 2009-2011 totaled $22,933,753; $18,373,397; and $20,101,294.

(4) In each tax year 2009-2011, Taxation processed the following number of NJ-1065s: 168,628; 175,517; and 182,745.  For each of those tax years, the total returns filed (for all types of income taxes) were about 4.7 to 4.9 million.

(5) All amounts collected as the filing fee were deposited into the General Fund, as part of the CBT, a category in the General Fund.

While not challenging the validity of the regulations, FGP contended that they do not cure the apportionment problem.  However, per FGP, this court can cure the DCC violation by applying the regulatory apportionment to the $250,000 cap amount.[9]

_____

[8]  In its complaint, FGP also alleged that it has no income derived from New Jersey, no nexus, the filing fee was paid for each owner and "not for the partnership itself," thus, since the non-resident investing public which are owners of FGP lack nexus to New Jersey, the fee violates the Due Process and Equal Protection Clause.  FGP also sought costs and attorney fees (at $75 per hour) claiming that Taxation's denial did not have a reasonable basis in law because it had litigated and lost BIS LP Inc., and the status of FGP was the same as the limited foreign partner in that case. For purposes of the instant motion, the parties agreed not to address nexus, the first part of the four-part criteria in Complete Auto.

[9] There was no fee apportionment for FGP because the number of its domestic or in-State partners caused the fee to reach the $250,000 cap.

In Targa Resources, L.P. v. Dir., Div. of Taxation, Docket No. 010749-2015, plaintiff ("Targa"), a publicly traded entity with over 65,000 partners, advocated similar arguments, except it contended that the regulations were invalid, but if this court could construe the Challenged Statute to preserve its constitutionality, then, the regulatory apportionment should be applied based on Targa's business allocation percentage.  FGP and Targa attended each other's oral arguments and filed briefs in support of each other's position, with Taxation filing responsive briefs.

Taxation cross-moved for partial summary judgment arguing that the levy is a regulatory fee intended to defray administrative costs of processing, examining, and auditing the significant numbers of partner/partnership returns, and thus, its constitutionality should be upheld pursuant to Am. Trucking Ass'ns v. Mich. Pub. Serv. Comm'n., 545 U.S. 429 (2005) (hereinafter "ATA-Michigan"). Further, as a regulatory fee, the court only need examine whether the amount is excessive when the benefits to a taxpayer are compared to the State's interests under Pike v. Bruce Church, Inc., 397 U.S. 137 (1970). Here, Taxation maintains, the fee is not excessive since $250,000 divided by the number of FGP's partners equates to a fee of less than $4 per partner. Alternatively, Taxation argues, even if the PFF is deemed a tax, it still does not violate the DCC because it is fairly apportioned under its regulations (no apportionment being required for New Jersey residents, who can avail of a credit for taxes under the GIT Act); it is non-discriminatory (applies to any partnership); and is co-relative to the State's services (by maintaining storage facilities in New Jersey, FGP availed itself of the State's public services, in addition to being able to do business here). Altering the regulatory apportionment as suggested by FGP would exceed this court's authority per Taxation, plus render the fee to less than a dollar per partner ($250,000 multiplied by FGP's allocation factor divided by number of partners), an unreasonable result.

**FINDINGS**

*(I) Principles of Review*

Every statute is presumed to be constitutional. "This presumption of validity is particularly strong in the realm of economic legislation adjusting the benefits and burdens of economic life." N.J. Ass'n of Health Plans v. Farmer, 342 N.J. Super. 536, 551 (App. Div. 2000) (citation and internal quotation marks omitted).

Where, as here, the issue is one of law, Taxation's assessments or statutory interpretations are not entitled to any particular deference or be considered presumptively correct. American Fire & Cas. Co. v. Dir., Div. of Taxation, 189 N.J. 65, 79 (2006) (court not "bound by the agency's interpretation . . . of a strictly legal issue") (citation and internal quotation marks omitted). See also Trailer Marine Transport Corp. v. Rivera Vazquez, 977 F.2d 1, 10 (1st Cir. 1992) ("In deciding whether discrimination exists . . . the deference normally afforded them in matters of economic regulation" is absent since the concern is, among others, "the national interest in a unified economy, [and] the lack of power of affected non-residents of the state to protect themselves through the state's political process . . .") (citation omitted). Nonetheless, a regulatory "interpretation" of a statute "receives substantial deference" being "necessary to assist in the application of statutes to achieve the legislative purpose," provided they do not "undermine legislative intent." Manheim NJ Invs., Inc. v. Dir., Div. of Taxation, 30 N.J. Tax 18, 33 (Tax 2017) (citations omitted).

*(II) The DCC Analysis*

In South Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2093-94 (2018), the Court, agreeing that physical presence is no longer a requirement to establish nexus and thus, the ability to tax,[10] explained that the purposes of the DCC was "to prevent States from engaging in economic discrimination so they would not divide into isolated, separable units." The "two primary principles" which limit a "State's authority to regulate interstate commerce" are that (1) State laws

---

[10] In so doing, the Court abrogated the holding in Quill Corp. v. North Dakota, 504 U.S. 298 (1992) that required physical presence to prove nexus. See Wayfair, Inc., 138 S. Ct. at 2099. The Court noted that the "nexus requirement is closely related . . . to the due process requirement that there be some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." Id. at 2093 (citations and internal quotation marks omitted).

"may not discriminate against interstate commerce," and, (2) "States may not impose undue burdens on interstate commerce." Id. at 2090-91. "[T]hese two principles guide the courts in adjudicating cases challenging state laws under the" DCC. Id. at 2091. Thus, there must be no disparate treatment of in-state versus out-of-state business/trade/commerce, or disparate effect on interstate commerce. If the statute "regulat[es] even-handedly to effectuate a legitimate local public interest," then it will be "upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." Ibid. (citing and quoting Pike, 397 U.S. at 142).

Where a State statue imposes a tax (on income or on a transaction), then the same "dual principles" viz., no facial discrimination or disparate impact on interstate commerce, also "animate" such cases. Wayfair, Inc., 138 S. Ct. at 2091. A State tax is valid "so long as it" meets the four-part test of Complete Auto, a "now-accepted framework." Wayfair, Inc., 138 S. Ct. at 2091. Thus, a tax statute will be "sustained" where its "practical effect" (as opposed to its "formal language") shows that the tax imposed "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." Complete Auto, 430 U.S. at 279 (overruling Spector Motor Srvc v. O'Connor, 340 U.S. 602 (1951) which had held that a tax for the privilege of engaging in business in a State was per se unconstitutional).

A tax is fairly apportioned if it is internally and externally consistent. Thus,

> The first . . . component of fairness in an apportionment formula is what might be called internal consistency -- that is, the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business' income being taxed. The second and more difficult requirement is what might be called external consistency -- the factor or factors used in the

16

> apportionment formula must actually reflect a reasonable sense of how income is generated.
>
> [Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 169-70 (1983).]

Internal consistency is based on pure hypothesis: a presumption that each State will impose a tax exactly the same as the challenged tax, and therefore the taxpayer's total income will be taxed multiple times unless reasonably apportioned. Stryker Corp. v. Dir., Div. of Taxation, 18 N.J. Tax 270, 290 (Tax 1999), aff'd, 168 N.J. 138 (2001). See also Bank of Am. Consumer Card Holdings v. Dir., Div. of Taxation, 29 N.J. Tax 427, 475 (Tax 2016) ("Internal consistency analyzes the hypothetical function of a tax formula, not its real world effects on a taxpayer."). Hypothesizing that "every State has the same tax structure, the internal consistency test allows courts to isolate the effect of a" tax,

> because it allows courts to distinguish between (1) tax schemes that inherently discriminate against interstate commerce without regard to the tax policies of other States, and (2) tax schemes that create disparate incentives to engage in interstate commerce (and sometimes result in double taxation) only as a result of the interaction of two different but nondiscriminatory and internally consistent schemes.
>
> [Comptroller of the Treasury v. Wynne, 135 S. Ct. 1787, 1803 (2015).]

See also Goldberg v. Sweet, 488 U.S. 252, 260-61 (1989) (". . . the central purpose behind the apportionment requirement is to ensure that each State taxes only its fair share of an interstate transaction."); Armco Inc. v. Hardesty, 467 U.S. 638, 644 (1984) ("A tax that unfairly apportions income from other States is a form of discrimination against interstate commerce."). Note that "the risk of cumulative tax burdens upon interstate transactions" can also be "avoided by a tax credit" for taxes paid to another taxing regime. KSS Transp. Corp. v. Baldwin, 9 N.J. Tax 273,

286 Tax 1987) (citations omitted), aff'd, 11 N.J. Tax 89 (App. Div. 1989). However, a State need not provide both a credit for, and an apportionment of, the tax. Id. at 286 (citation and quotation omitted).

Protection under the DCC is not restricted to non-residents. See Wynne, 135 S. Ct. at 1798-99 (the "dictum" that the DCC did not "protect state residents from their own state taxes," see Goldberg, 488 U.S. at 266, has been "repudiated," thus, although a State can tax a resident's income from all sources without violating due process, it can be vulnerable to an attack that such tax violates the DCC) (relying upon Quill Corp., 504 U.S. at 305). Although Quill has since been abrogated by Wayfair, Inc., see supra note 10, the abrogation was not to the effect that the DCC does not extend to residents.

Prior precedent treated State levies which were deemed regulatory fees or user fees differently from taxes for purposes of the DCC. See, e.g., Edison Co. v. Montana, 453 U.S. 609, 622, n.12 (1981) (where the "charges are purportedly assessed to reimburse the State for costs incurred in providing specific quantifiable services, we have required a showing, based on factual evidence in the record, that the fees charged do not appear to be manifestly disproportionate to the services rendered.") (citations and internal quotation marks omitted); Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, 405 U.S. 707, 716-17 (1972) ($1 per-passenger fee imposed to defray the cost of constructing and maintaining the airport's facilities valid under the DCC if the fee fairly approximates the use, is not discriminatory, and is not "excessive in comparison with the governmental benefit conferred.").[11]

---

[11] The Evansville test would not apply here since the PFF is not imposed for the use of a facility in New Jersey. See also Am. Trucking Ass'ns v. DOT, 124 P.3d 1210, 1216 (Ore. 2005) ("[A]side from the Evansville-Vanderburgh case itself, the test articulated therein has never actually been

However, later United States Supreme Court precedent extended the <u>Complete Auto</u> analysis to fees or taxes. <u>See e.g.</u> <u>Am. Trucking Ass'ns v. Scheiner</u>, 483 U.S. 266, 271, 273-74 (1987) (labeling Pennsylvania's "lump-sum annual fees" for issuance of an identification marker and axle taxes which reduced this fee as "'flat taxes'"). This then blurred the distinction between taxes and fees for purposes of a DCC analysis. <u>See also</u> <u>Am. Trucking Ass'ns v. State</u>, 180 N.J. 377, 403 (2004) (hereinafter "<u>ATA-NJ</u>") (although the United States Supreme Court precedent "for ease of reference" defines a levy "that is impermissible because it discriminates against or unduly burdens interstate commerce" as a tax, and "a charge that reflects—fairly, evenly, and sustainably—the States' police power interests and concerns" as a fee, ultimately, the label of the levy "has no effect on the result."); <u>Nw. Energetic Serv., LLC v. Ca. Franchise Tax Bd.</u>, 71 Cal. Rptr. 3d 642, 659 n.12 (Ct. App. 2008) (no "difference whether the [l]evy is characterized as a tax or a fee for [DCC] purposes" as evident from the Supreme Court's precedent, making the DCC "appli[cable] to taxes and regulations that discriminate against or unduly burden interstate commerce.") (citation omitted).

Thus, our Supreme Court "reject[ed]" the argument "that as long as a flat fee is a regulatory user fee, it is not subject to the four-prong test of <u>Complete Auto</u>," because this contention "ignores the" principle "that it is the practical effect of the charge that controls, not its formal language or purported structure." <u>ATA-NJ</u>, 180 N.J. at 409 (citation and internal quotation marks omitted). Rather, it held, based on <u>Scheiner</u>, if a statute involves "unapportioned state fees and taxes," then it is "unconstitutional if it violates the internal consistency test . . . ." <u>ATA-NJ</u>, 180 N.J. at 397.

---

used again by a majority of the Court to decide a Commerce Clause controversy," in addition to the fact that the case was overruled by statute).

However, the United States Supreme Court subsequently held that there is "[n]othing in our case law" that "suggests that . . . [a] neutral, locally focused [unapportioned] fee or tax is inconsistent with the [DCC]," thus, Michigan's flat $100 "fee [that] taxes purely local activity" was valid. ATA-Michigan, 545 U.S. at 434, 437-38. This validity was not destroyed even if the fee would flunk the internal consistency's hypothetical test. Id. at 438.

The initial burden of proof is upon the party challenging a statute's constitutionality to show that the levy is discriminatory. ATA-NJ, 180 N.J. at 396. The State must then show the fee is not discriminatory, or alternatively, "that a more accurately apportioned fee is impracticable." Id. at 397. This is same standard of proof for a tax, namely, that the plaintiff has the burden to prove that a "fee is unapportioned," and "i[f] Scheiner controls," the State must then show the fee is not discriminatory, and a better apportionment cannot be achieved. Ibid. Even if the court applies "a less stringent constitutional test," then the challenger "retain[s] the burden to prove that the fee discriminates in practical effect." Ibid. (citations omitted). It would appear that the same initial burden and burden shifting would apply for user or regulatory fees, i.e., for plaintiff to first show that the fee excessively burdens interstate commerce, and then for the government to show that the fee is not excessive when compared to the governmental benefit.

The above various rulings[12] provide the following framework for a DCC analysis of a State-imposed levy:

> (1)    If a statute discriminates facially or in practical effect, it is invalid. The challenger has the burden to prove discrimination either way. If discrimination is proven, the State must then justify the statute vis-à-vis the local benefits, and lack of

---

[12] As was pertinently noted, the United States Supreme Court's "[DCC] jurisprudence is less than a model of clarity," due to the differing tests for exactions for "general regulatory measures," taxes, or user fees, thus, creating a "quagmire of judicial responses," causing "several distinct but overlapping tests." MERSCORP Holdings, Inc. v. Malloy, 131 A.3d 220, 235 (Conn.), cert. denied, 137 S. Ct. 372 (2016).

nondiscriminatory alternatives. This is the "less stringent" test, albeit still a heightened scrutiny.

(2) Generally, a tax is subject to a stricter test, i.e., it must also be internally consistent, and thus, must be fairly apportioned. The challenger has the burden to prove the lack of apportionment. The State must then justify the statute as being non-discriminatory, or that it cannot achieve a more "accurately apportioned fee." A State need not provide both a credit for, and an apportionment of, the challenged tax.

(3) If a statute or regulation is not discriminatory facially or in practical effect, then the statute may need to be examined under the burden-benefit balancing test if the excessiveness of the fee burdens interstate commerce. It would appear that the same initial burden of proof is on the challenger to prove discrimination, and then the excessiveness of the burden on interstate commerce when compared to the governmental benefit, after which the burden will shift to the State in proving the opposite.

(4) The label of the levy is irrelevant to decide whether State law or regulation discriminates against interstate commerce.

(5) The DCC protection applies to residents and non-residents.

(6) For purposes of the DCC analysis, flat fees are sometimes treated as taxes, thus subject to the four-part test of Complete Auto, but sometimes not, especially if the levy is found to be non-discriminatory and applies only to intrastate transactions.

*(A) What is the Interstate Commerce Claimed to be Negatively Burdened by the Filing Fee?*

Before the court starts its DCC analysis, it must determine the "commerce" or the transaction or activity which is being allegedly discriminated by the PFF. See e.g. DIRECTV v. Utah State Tax Comm'n, 364 P.3d 1036, 1042 (Utah 2015) ("[T]he threshold matter [is] . . . defining interstate commerce . . . [namely,] identifying the 'interstate element' on which discrimination is prohibited, or in other words, the grounds on which a business is counted as a 'local' one that may not be favored.") (citation omitted). Neither party found it necessary to identify this element of the DCC analysis but presumed that interstate commerce is implicated.

21

Evidently, the activity or transaction is not the sale of the propane tanks nation-wide since that is the Operating Partnership's business, and the Operating Partnership has not challenged the fee as violating the DCC. FGP's status is that of a partner, and thus, it is the recipient of income from the Operating Partnership. However, because it is treated as a partnership, it is also subject to the PFF. FGP's activity, from the facts presented here, is its investment in its affiliate directly or indirectly, which in turn facilitates (in part or otherwise) the earning of income by the Operating Partnership. Stated differently, the "commerce" being impacted is FGP's provision of capital, and its facilitation of the provision of capital by residents and nonresidents, to the Operating Partnership, directly or indirectly, which investment enables FGP to earn income from the Operating Partnership, thus, to earn New Jersey source income. See, e.g., Park Pet Shop, Inc. v. City of Chicago, 872 F.3d 495, 501 (7th Cir. 2017) ("[T]he movement of goods, services, funds, and people" is interstate commerce.); Gibbons v. Ogden, 22 U.S. 1, 189-90 (1824) (The term "[c]ommerce" in the Commerce Clause is "traffic," however, "it is something more: it is intercourse."). Such commerce could be interstate because FGP is a foreign partnership as are some of its partners, thus, capital contributions from such partners, when infused into the Operating Partnership, and used in the latter's activities which are both in and out-of-State, can implicate interstate commerce.

However, simply because FGP may be considered as being involved in interstate commerce does not mean that the DCC is automatically implicated, and without more, render a levy, regardless of whether it is labeled a fee or a tax, as violating the DCC. See, e.g., ATA-Michigan, 545 U.S. at 432-34 (rejecting plaintiff's claim that trucks which carry "both interstate and intrastate loads engage" more in interstate business, therefore, the flat $100 fee per truck violated the DCC). Rather, the question for purposes of the DCC is what is the activity for which

the PFF is imposed under the Challenged Statute, and whether the same discriminates against FGP's investment activity by improperly favoring investment activity (via direct/indirect capital contributions to a partnership) in a local business, operation, or activity, to the disadvantage of that same investment activity in an out-of-State business, operation or activity. See Wayfair, Inc., 138 S. Ct. at 2100 (DCC "cases usually prevent States from discriminating between in-state and out-of-state firms.") (Gorsuch, J., concurring).

*(B)  What is the Activity Targeted by the Challenged Statute?*

The Challenged Statute imposes a fee upon a partnership provided it derives New Jersey source income, and such fee must be paid when the NJ-1065 is filed (plus 50% of the fee as an installment for the succeeding tax year). The legislative history shows that our Legislature wanted to track New Jersey sourced income earned or derived by partnerships engaged in business (as opposed to small investment clubs), since partnerships are not themselves taxed, and instead pass-through the income earned/derived to partners, who/which are taxed. This would entail processing and reviewing information and tax returns, which would cost money, therefore, the Legislature used the filing fee as a mechanism to pay such costs. The legislative history would thus support a reading that the activity or transaction for which the fee is imposed is based on the governmental activity of processing/reviewing returns, and the government is regulating partnerships by tracking their New Jersey source income. Such regulation or governmental activity is a purely intrastate activity and is not commerce, let alone interstate commerce.

Legislative history also shows a concern that income earned by large pass-through entities may be escaping tax, and thus merited a fee. Whereas small firms or investment clubs should not be charged the same fee because they do not operate like large partnerships do. Cognizant that pass-through entities do not pay income tax, the Legislature's primary concern was to ensure that

23

the pass-through New Jersey-derived income by large pass-through entities be captured, and because these large multi-national entities can (and did) use sophisticated planning so that the pass-through income is difficult to trace and be captured, there was an urgent need for the "tracking" of such income, which then required a review of these entities' informational returns and its members' tax returns. Tracking such income, and ensuring that the reported income is captured, and if constitutionally permissible, taxed at the partner-level, was the underlying basis for the imposition of the partnership processing fee. It is eminently within a State's regulatory power to ensure proper compliance with reporting income that should be sourced to the State, and for the State to track income that is sourced but not taxed since it is passed-through (i.e., not taxed at the entity level, but to be taxed at the recipient level), so that a State can assure that/decide whether income derived from within the State is not improperly escaping being taxed.

That the review of informational returns encompasses, and indeed requires, a review of a partnership's income earned everywhere, does not implicate the DCC, nor convert the PFF into a levy violating the DCC. Taxation has always been statutorily obligated to determine the proper/reasonable amount of income/loss allocable to New Jersey. See N.J.S.A. 54:10A-6; -8 (CBT); N.J.S.A. 54A:5-7 (GIT). Indeed, every State from which FGP derives income would examine returns to ensure that the correct or reasonable amount of income is allocated to that State. Cf. Vizio, Inc. v. Klee, 886 F.3d 249, 255 (2d Cir. 2018) (rejecting an argument that "Connecticut is prohibited from referencing national market share when it assesses recycling fees because doing so regulates—thereby placing a burden on—interstate commerce.").

Verily, the fee is imposed only if the partnership derives New Jersey source income. Note that this is also an alternative condition for filing the NJ-1065, the other being that the partnership has a resident partner. See N.J.S.A. 54A:8-6(b)(1) ("Each entity classified as a partnership for

24

federal income tax purposes, including but not limited to a partnership," a limited liability partnership, or an LLC, "having a resident owner of an interest in the entity or having any income derived from New Jersey sources, shall" file an NJ-1065). Leaving aside the question of whether the fee would apply to a partnership with no New Jersey source income, but yet must file an NJ-1065 because it has a partner who/which is a New Jersey resident/domestic entity,[13] the filing fee is imposed not for earning that income, but is instead a recovery of State costs for tracking that income. Cf. Nw. Energetic Serv., 71 Cal. Rptr. 3d at 658 (finding unconstitutional a fee imposed on an LLC computed at "a percentage of the LLC's total worldwide income," as opposed to a "flat fee imposed on all LLC's for the privilege of doing business locally in California," and consequently, the fee "does tax a share of interstate transactions.").

Under these circumstances, the court is satisfied that the PFF is imposed to expense the costs of and for a purely intrastate or local activity, which is tracking of New Jersey source income via filed returns. As such, it does not implicate the DCC under ATA-Michigan even if it is imposed on an interstate commerce participant, such as FGP here.

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2 (c). Whether the PFF is imposed on an intrastate or

---

[13] Taxation's July 2016 Bulletin notes that the fee applies if the partnership has New Jersey sourced income or loss or "any type of New Jersey resident partner." This conflicts with the language of the Challenged Statute especially considering the legislative clarification of the original proposed bill that the fee will "apply only to partnerships that derive income from New Jersey." Assembly Budget Comm. Statement to A. 2501 13; A. 2501 (June 28, 2002).

interstate activity is a legal question, thus summary judgment on this issue in favor of Taxation is proper.

*(C) The PFF Does Not Facially Discriminate against FGP or FGP's Activity.*

There are additional reasons for denial of FGP's partial summary judgment motion. First, the Challenged Statue provides no "home" based advantage, that is, one which favors local over foreign partnerships. The Legislature was only concerned with a core problem of ensuring that New Jersey sourced income of pass-through entities be tracked.[14] The imposition of the PFF is not based on the location of the partnership, or the nature/scope of its particular business activity. Thus, regardless of whether (1) the partnership is domestic or foreign; (2) the partnership entity derives income only from New Jersey or from all other States; (3) the partnership engages in intrastate or interstate activities or business (whatever be the nature); (4) the partners of the partnership are New Jersey residents or non-residents, or are foreign or domestic corporate or pass-through entities; or (5) the partners of the partnership do business (whatever be the nature of such business) wholly intrastate or partially intrastate, the PFF is imposed if the partnership has New Jersey source income to be reported on an NJ-1065.

New Jersey is not exercising any economic protectionism by unduly favoring in-State activities or transactions over those same activities or transactions conducted interstate. See, e.g., DIRECTV, 364 P.3d at 1042 (the United States Supreme Court's precedent involving a "strict [DCC] scrutiny have involved favoritism for entities or business operations within a particular state—and attendant discrimination against entities or business operations outside such state.").

---

[14] This is not necessarily true for PCs because those are not pass-through entities. However, the court does not decide this issue since the fee on PCs is imposed under a different statute, and since FGP is treated as a partnership, thus, falls within the scope of the Challenged Statute herein.

26

The PFF does not bar any pass-through entity from earning income/loss outside New Jersey, nor does it incentivize or promote local business over out-of-State business. To the contrary, domestic partnerships pay the same PFF, and are subject to the same $250,000 cap as non-domestic partnerships. Thus, New Jersey is not requiring that an activity which was done out-of-State now be done only in New Jersey.

There are no "in-state businesses gainers or out-of-state businesses losers." Id. at 1047 (citation and internal quotation marks omitted). Nor is there any "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Or. Waste Sys. v. Dep't of Envtl. Quality, 511 U.S. 93, 99 (1994). Therefore, the Challenged Statute is facially neutral and regulates even-handedly.

*(D) There is no Proof of that the PFF Causes a Disparate Impact on FGP's Investment Activity*

Second, the court has no proof of a disparate impact on FGP or FGP's investment activity. It may be a possible outcome that entities or individuals which/who invest in partnerships would face lesser return for their investments (i.e., through a possible lower pass-through distributive share of income since the amount paid as the PFF would be deducted as an entity-level business expense from the entity-level income). It may be that there would be less of an incentive to do business using a partnership or LLC form of business entity, since the PFF is an added expense/cost to the entity. It may be that there would be a similar disincentive to form partnerships with over 1,667 partners (since that number times $150 is $250,000). Do these possibilities result in an impermissible burden on interstate commerce? In other words, does the Challenged Statute prevent out-of-State entities or businesses from doing business in New Jersey by making them pay more than their share of a State-imposed levy or by making it so expensive, disproportionately for

27

them, to participate in New Jersey business, and thus, cause a disparate impact on FGP's investment activity?

Initially, the court opines that this is not so. Out-of-State partnerships earning New Jersey source income/loss are not paying any more than an in-State partnership earning income in New Jersey since each will pay the same PFF and the same cap amount (if each had more than 1,667 partners). Of course, the cost of doing business in the partnership form of a business model has increased due to the PFF, just as it would for any kind of levy. However, this in-and-of itself does not state a cause of action under the DCC especially where both such in-State and out-of-State entities are equally burdened with the PFF. See ATA-Michigan, 545 U.S. at 438 (DCC "does not seek to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing business" (citation omitted)).

That smaller sized intrastate or interstate partnerships would pay a lesser amount than a large, publicly-traded partnership such as FGP, which could almost always pay $250,000 (the cap amount), does not convert the statute into an attempt to unconstitutionally burden or discriminate against interstate commerce. This is a business model FGP chose (for whatever business purposes, whether to easily obtain larger amounts of investment, or otherwise to protect/increase the stock/investment of the employees of its general partner, Ferrellgas Inc.). Cf. DIRECTTV, 364 P.2d at 1042-44 (precedent shows that the DCC "is not implicated by mere discrimination based on 'differences between the nature of [two] businesses,' and not on the 'location of their activities,' or due to the "category of companies.") (citing and quoting Amerada Hess Corp. v. Dir., Div. of Taxation, 490 U.S. 66, 78 (1989)). Indeed, under the economies of scale, the PFF for a large partnership such as FGP is extremely low (if the $250,000 cap is divided by the number of partners), as compared to a smaller partnership. This would also evidence that if the PFF was

28

somehow deemed to impact interstate commerce (FGP's investment directly or indirectly in the Operating Partnership), the effect on interstate commerce would be minimal or only incidental.

More importantly, FGP has not provided any proof that its interstate commerce is unduly burdened. For instance, there is nothing to show that of the number of returns filed by pass-through entities, the largest percentage is that of out-of-state such entities; that the largest percentage of those entities' income is from non-New Jersey sources; and that such percentages would prove that the PFF is discriminatory in practical effect against such entities and in favor of local businesses. Nor is there anything to show that pass-through entities such as FGP, are the largest out-of-state investors, and thus are the most prejudiced by the PFF because the cost to invest in, or contribute capital to, their affiliated partnerships, which sell/trade tangible goods, or sell services, in-state and out-of-state, is much greater than the cost to an in-state similar investor.

FGP's resort to the mechanical application of the hypothetical math under the internal consistency component of Complete Auto is not a substitute for its burden of proving, at least prima facie, that the PFF results in a disparate impact on its interstate investment activity. Even in Scheiner there was a separate independent proof of disparate impact. See 483 U.S. at 276 (domestic trucks traveled five times more miles on Pennsylvania roads compared to out-of-state truckers, but the cost per mile of the flat taxes was about five times higher for out-of-state vehicles when compared to local trucks, and while both domestic and out-of-state trucks traveled about the same number of miles on Pennsylvania highways, "less than" a sixth of axle tax revenues were from local vehicles, thus, disparate impact on interstate commerce was shown). Similarly, in ATA-NJ, the plaintiff provided proof of disparate impact and the burden then shifted to the State, which was unable to meet it. See 180 N.J. at 387-89, 411 (fee challengers "made a prima facie showing that the fees discriminate in practical effect . . . [by] show[ing] that, based on several

29

measures, out-of-state truckers pay between twice as much and almost three times as much as in-state truckers pay," thus, the "fact" is that " among businesses similarly engaged, out-of-state truckers will pay a distinctly higher cost per activity on average than in-state truckers will pay"). Indeed, the lower court found that since "neither" party proved "what the relative impact of the fee is on in-state and out-of-state haulers," and with no proof of non-discrimination or fairness, the court was "compelled" to invalidate the fee "under the presumption that a flat truck fee is violative of the" DCC. Id. at 394.

Precedent is also uniform in this regard. See ATA-Michigan, 545 U.S. at 414-17 (rejecting plaintiff's argument that it need not provide any "empirical[]" evidence to show that the flat fee was burdensome or had a practical discriminatory effect on "interstate trucking"); MERSCORP Holdings, Inc., 131 A.3d at 481 (no showing by plaintiff to prove that higher recording fees will prevent participation in the activity, or that the "market would be compromised"); Am. Trucking Ass'ns., 124 P.3d at 1220 (". . . plaintiffs cannot rely on hypothetical assertions to establish the existence of discriminatory economic effects; plaintiffs must demonstrate actual discrimination . . . [otherwise] virtually every uniformly assessed local fee would be in jeopardy if it touched some aspect of interstate commerce. That, of course, is not the aim of the [DCC]."). See also Dunn v. Idaho State Tax Comm'n, 403 P.3d 309, 315 (Idaho, 2017) ("Wynne endorsed the internal consistency test as a method of identifying discriminatory tax schemes" but "does not do away with the other showings necessary to implicate the Commerce Clause, i.e., 'a substantial effect on an identifiable interstate economic activity or market.'").[15]

---

[15] Two Justices have consistently and strongly criticized the internal consistency requirement as "a judicial fraud." Wynne, 135 S. Ct. at 1808-10 (Scalia J. and Thomas J. dissenting).

Importantly, much after Scheiner and ATA-NJ were decided, the United States Supreme Court upheld a flat fee that taxed trucks as non-discriminatory although the fee would fail the internal consistency test. Thus, in ATA-Michigan the Court upheld the validity of Michigan's "flat $100 fee" because it did not "tax activity that takes place, in whole or in part, outside the State." 545 U.S. at 434. The Court "concede[d]" that if the same fee was imposed by all States, "an interstate truck" would pay much more in fees, under the hypothetical internal consistency test. Id. at 438. The Court explained away this hypothetical problem by holding that a trucker transporting goods in-and-out of State is paid much more "only because it engages in local business in all those States." Ibid.

Thus, FGP's reliance on the hypothetical fee imposition by 50 States as proof of disparate impact on interstate commerce (i.e. on its investment activity) is misplaced, and is certainly not the law. As the dissents in Scheiner noted, "internal consistency" should not be seen as a "rule of general application," and precedent did not "establish[] a grandiose version of the 'internal consistency test' as the constitutional measure of all state taxes under the" DCC, thus, do not "stand for the proposition that nondiscriminatory state taxes must also generally be 'internally consistent' to pass constitutional muster." 483 U.S. at 303 (O'Connor, J., dissenting) (citing Armco, Inc., 467 U.S. 638). Otherwise, "any unapportioned flat tax involving multistate activities" would be invalidated. Id. at 303-04 (Scalia, J., dissenting). See also Am. Trucking Ass'ns, 124 P.3d at 1219 (". . . the Supreme Court has never viewed hypothetical possibilities, standing alone, as sufficient to constitute unconstitutional discrimination for Commerce Clause purposes").

The focus of the query in a DCC challenge is not that any levy payable by an interstate commerce participant is automatically suspect unless apportioned. Rather it is whether a levy

discriminates facially or practically.[16] See also ATA-NJ, 180 N.J. at 403 (a levy is a tax if it is "an impost that is impermissible because it discriminates against or unduly burdens interstate commerce.") This definition also evidences the crux of a DCC challenge – discrimination. If the only test for a levy was whether it passed the hypothetical internal consistency test, then any flat levy would necessarily fail simply by virtue of the arithmetic. If so, the presumptive constitutionality of any statute imposing any flat levy would be easily overcome, and thus, the burden imposed upon a challenger would become almost illusory. In any event, such is not the intent of the DCC, nor of the internal consistency test. The latter test was formulated to insure that 100% of income earned by a taxpayer in a business operating in multi-states is divided among the States in which income is earned, so that the total tax paid by the multi-state business is equal to the tax on 100% of income, if that income was earned intrastate. Here, no such multi-state income tax is implicated at all due to the partnership filing fee. Thus, FGP labeling the PFF as a flat tax so that the Complete Auto tests are automatically applied is no less controlling that Taxation labeling the PFF as a purely regulatory fee so that the Complete Auto tests should not apply.[17]

The Court in ATA-NJ noted that "[i]f Scheiner applies," then an unapportioned levy must be internally consistent. 180 N.J. at 397. Here, this court has found that the Challenged Statute

---

[16] As one article noted, "the apportionment prong is not an independent concept but is merely an application of the nondiscrimination requirement" of the Complete Autot test. See Ryan Lirette and Alan D. Ward, Putting the Commerce Back in the Dormant Commerce Clause: State Taxes, State Subsidies, and Commerce Neutrality, 24 J.L. & Policy 467, 477 (2016).

[17] In this regard, the court is not persuaded that simply because the PFF is deposited into the general funds, it is a flat tax that must be apportioned pursuant to Complete Auto. Both fees and taxes raise revenues, just as they both impose a cost on a business. See generally BTD-1996 NPC 1 LLC v. 350 Warren L.P., 170 N.J. 90 (2001) (revenue raised in connection with the State's regulation of a business, and used to "defray[] the expense fairly attributable to the regulative process" is not a tax even if the revenues collected exceed the governmental costs).

imposes the PFF for a purely intrastate reason.  Therefore, Scheiner would not automatically apply.

Additionally, the Challenged Statute is neutral facially, and there is no proof of any disparate

impact or undue burden on FGP's investment activity due to the PFF.  Therefore, the court is not

bound to examine the application of the internal or external consistency tests, or whether the PFF

amount is fairly related to the services provided by the State.  See, e.g., Edelman v N.Y. State

Dept. of Taxation & Fin., 162 A.D.3d 574, 575-576 (N.Y. App. Div. 2018) ("Where Commerce

Clause scrutiny reveals that the statute at issue does not affect interstate commerce, there is no

need for a test determining whether the statute unduly burdens interstate commerce."); Park Pet

Shop, Inc., 872 F.3d at 502 ("[n]o disparate treatment, no disparate impact, no problem under the"

DCC) (citation omitted).

Thus, FGP's motion for partial summary judgment is denied for the additional reasons that

the Challenged Statute is commerce-neutral and there is no proof of a disparate impact on interstate

commerce.

(E)  Is a DCC Violation Proven because Taxation's Regulations Apportion the PFF?

Due to the court's denial of partial summary judgment to FGP, it need not address the

validity of Taxation's regulations which permit an apportionment of the PFF.  However, because

these regulations permit an inference that Taxation acknowledges a DCC problem with the

Challenged Statute, the court briefly addresses the validity of the regulations.

First, the regulatory apportionment (only to non-resident partners, with no physical nexus

to New Jersey, and if the partner is an entity, then only if it has an office outside New Jersey, see

N.J.A.C. 18:35-11.2(b)), exceeds the statute's plain language and intent, and as such, improperly

33

exceeds the scope of the statute.[18]  See Fedders Fin. Corp. v. Dir., Div. of Taxation, 96 N.J. 376,

392 (1984) (". . . an administrative interpretation which attempts to add to a statute something

which is not there can furnish no sustenance to the enactment . . . nor may it give the statute any

greater effect than its language allows.") (citations and internal quotation marks omitted).

Second, the regulations permit an apportionment at the partner level.  Yet, all parties agree

that the PFF is imposed at the entity level.  The fee is based on the fact that the partnership has

New Jersey source income, not how much, and not how much of that income is distributed to a

partner.  The role of the partner in the Challenged Statute is for a head count, not for a consideration

of the partner's residency or nexus, or lack thereof.

Third, the benefit of the apportionment inures only to partnerships which have nonresident

partners (individuals or foreign corporate/pass-through entities).  Thus, a partnership with only

domestic partners (corporate or New Jersey resident individuals), will always have to pay a full

fee even if that entity does business in multiple States.  It is unclear how this distinction achieves

fairness when the partnerships are similarly situated (operating or deriving income from multiple

States including New Jersey, and having to file informational returns in New Jersey and

elsewhere).  Either way, Taxation will (or should) be reviewing the same number of returns (of the

partnerships and of the partners), and expending the same quantity and quality of review and effort

in examining those returns.

---

[18] The requirement of an office outside New Jersey is also suspect.  Prior law required 100% allocation of corporate income to New Jersey if the corporate entity did not have a regular place of business outside the State.  N.J.S.A. 54:10A-6.  This requirement was removed effective July 1, 2010.  See L. 2008, c. 120 § 2.  Since Taxation's regulations as to the partnership filing fee were promulgated in 2003, its conditioning an apportionment only if the partnership had an office outside New Jersey, was appropriate.  This no longer being a statutory requirement, Taxation's insistence on the same as a condition for the fee apportionment is questionable.

Note that a justification that residents cannot claim protection of the DCC is incorrect. See Wynne, 135 S. Ct. at 1798-99. Taxation claims that a resident can claim credit for taxes paid in other States under N.J.S.A. 54A:4-1. However, the plain language of this credit statute does not allow for such an expansive reading as proffered by Taxation primarily because the credit is for a tax "on income" paid by the individual taxpayer. Here, the PFF is imposed upon and paid by a partnership, and the measure of the fee is not income earned by the partner (or even by the partnership).

True, this court must strive to save the constitutionality of the Challenged Statute, and try to construe it in a manner to achieve that purpose. See e.g. Whirlpool Properties, Inc., 208 N.J. at 151. Nonetheless, this principle does not apply here since the court is not finding the Challenged Statute as unconstitutional under the DCC. Even if it had, the plain language of the Challenged Statute does not permit imposition of an apportionment. See DiProspero v. Penn, 183 N.J. 477, 492 (2005) (court cannot "rewrite a plainly-written" statute, "write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment," or "engage in conjecture or surmise which will circumvent the plain meaning of the act."). Although this court need not accept a regulation if it incorrectly interprets the law, nonetheless, the court lacks authority to "cure" a regulation by providing an apportionment of the PFF as desired by FGP. See, e.g., Camps Newfound/Owatonna v. Twp. of Harrison, 520 U.S. 564, 618 (1997) (DCC analysis should not be used to "make policy-laden judgments that [courts] are ill-equipped and arguably unauthorized to make") (citation omitted) (Thomas, J., dissenting); Moorman Mfg. Co. v. Bair, 437 U.S. 267, 277-78 (1978) (rejecting a request that a State use the three-factor apportionment formula similar to

35

other States to avoid multiple taxation, as opposed to the statutorily prescribed single factor, since this "would require extensive judicial lawmaking.").[19]

The court is aware that in an unrelated GIT case, it did not strike down Taxation's regulation that had provided a credit for taxes paid to other states by a New Jersey resident who was a shareholder in an S corporation that did business outside New Jersey even though the statute, N.J.S.A. 54A:4-1(c), plainly stated that no credit is allowed "for the amount of any income tax or wage tax imposed for the taxable year on S Corporation income allocated to this State." See Beljakovic v. Dir., Div. of Taxation, 26 N.J. Tax 455 (Tax 2012). However, that case is readily distinguishable. There, unlike here, the statute provided for an apportionment (by a credit for income taxes paid to other States by New Jersey residents), yet disallowed the same for a resident S corporation shareholder. Thus, when the regulations provided for an apportionment (by a credit for taxes paid to other states) to a resident S corporation shareholder, but only for income sourced outside the State, they were in conformance with the statutory intent, and were thus, proper. Here, the Challenged Statute does not provide for any apportionment, thus, does not allow for a reading that the same is readily or implicitly inferable. Therefore, Beljakovic does not control or require acceptance/application of Taxation's fee-apportionment regulations.

*(F) Application of the Pike Balancing Test*

As noted above, a statute that regulates a business or trade will be upheld provided it is done "even-handedly to effectuate a legitimate local public interest," and does not impose such a

---

[19]  Note that even if the court were to find (based on facts and evidence before it) that the Challenged Statute violates the DCC by causing a disparate impact on interstate commerce, it still cannot cure the statute by (1) enforcing the regulatory apportionment; (2) re-writing the regulations and substitute the allocation methodology proffered by FGP which is limited to only how the $250,000 cap should be apportioned.

burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." Wayfair, Inc., 138 S. Ct. at 2091 (citing and quoting Pike, 397 U.S. at 142).[20]

Pike did not involve a levy (a fee or tax). Rather, the Court analyzed a regulation whereby Arizona barred a corporation from transporting uncrated cantaloupes to be packed and processed in the entity's California packing/processing facility, and found that "the practical effect of" Arizona's regulation "would be to compel the company to build packing facilities in or near . . . Arizona" causing loss of time and money. Pike, 397 U.S. at 138, 140. In ruling that an even-handed regulation will not be stricken when "its effects on interstate commerce are only incidental," but would if the burden on interstate commerce was excessive, id. at 142, the Court held:

> If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Occasionally the Court has candidly undertaken a balancing approach in resolving these issues . . . but more frequently it has spoken in terms of 'direct' and 'indirect' effects and burdens . . . .
>
> [Ibid.] (citations omitted)

While Arizona's interest in showing its name on the packaging maybe legitimate, it was "tenuous" when compared to the unnecessary costs it imposed on the corporation. Id. at 154. The resultant burden on interstate commerce was "constitutionally, more significant than its extent." Ibid.

---

[20] A state law "may fall into one of three categories, for purposes of a [DCC] analysis: (1) disparate treatment; (2) disparate impact; and (3) laws that do not give local firms any competitive advantage over those located elsewhere." Park Pet Shop, Inc., 872 F.3d at 502. The law which falls under third category is one "which affect[s] but [does] not burden commerce," and is analyzed under a "rational-basis review." Ibid. Here, the parties' motions addressed only the DCC analysis. Therefore, although this court has found no DCC issues, it will not apply the rational basis suggested in Park Pet Shop, Inc., 872 F.3d at 502.

Here, it is not even clear whether <u>Pike</u> should apply. This court was not able to find, neither did the parties provide, any controlling case to which <u>Pike</u> applies in the in the context of a challenged fee or tax. Additionally, <u>Pike</u> only applies should the court find no discrimination, facially or in practical effect. Here, the court found that the DCC is not implicated since the fee is to defray costs of a purely intrastate activity, and further that the Challenged Statute is facially neutral, and with no proof of disparate impact on interstate commerce. As a result there is no need to examine the application of <u>Pike</u> here.

Even if the court were to examine the application of <u>Pike</u> (if the PFF may have an incidental but not disparate impact on FGP's investment activity), FGP has not shown that the PFF imposes an excessive burden on its interstate commerce. While it did provide information to show that the salaries paid (<u>i.e.</u> the governmental costs sought to be recovered from partnerships) appear to be about half of the revenues raised by the PFF, rendering the per-partner fee of $4 ($19 million in salaries divided by 4.7 million returns = $4 per return), this does not prove that the PFF is an "excessive" burden on its investment activity. Additionally, it is not even clear that salaries only can be the only measure of governmental costs sought to be recovered from partnerships.

Even if FGP's initial "raw" salary information can be deemed to equate to the State's costs,[21] Taxation has not provided any independent information to show that the fee at the rate of

---

[21] Although FGP's OPRA request included information as to the "expenses or costs" such as wages, equipment cost, information technology cost, it apparently agreed to narrow its request to salaries paid. Further, FGP's OPRA requests were denied for one reason or other. Its request for any "study, analysis, or other document" relative to "the cost of receiving and processing returns" under the GIT Act, was denied on grounds there were none. The OPRA unit stated that Taxation "did not prepare any fiscal information for Assembly Bill 2501," thus, any records as to the fiscal estimates did not exist. Neither was such information available as to the OLS' estimates, since they were "destroyed" in 2009. A similar unavailability response attached to FGP's request on "how the Legislature arrived at the $150 per owner processing fee," including any study or analysis in this regard. The OPRA unit also denied FGP's request for data or worksheets to support the

$150 per-partner or the $250,000 cap is not excessive. It complains that the total salaries are underestimated since they must include the value of employee benefits. Yet, it provides no data in this regard. It complains that the results look low due to over-simplified math, yet does not provide any data to show why the math is unreliable or provides an incredible/unreasonable result. Indeed, although the fiscal estimate noted that the projected revenues from the partnership filing fee was based on data "collected by" Taxation, Taxation claimed that its files contain almost nothing in this regard.

Further, Taxation's argument that the $250,000 cap when applied to FGP equals to a cost of about $4 per-partner does not prove the reasonableness of the fee amount. Rather, it tends to show otherwise since the activity of reviewing returns can be performed for less than $4 per-partner. Similarly, its argument that a 3-partner partnership will pay only $450 as the fee, which is lesser than the minimum CBT in 2009 ($500 to $2,000), does not prove that the $150 per partner is reasonable.[22] This is especially true where the minimum CBT, which is imposed for the

_____

computation of amounts shown in the annual budgets as appropriation for Taxation and Division of Revenue for FYs 2009-2011, as being unduly onerous, not in possession, and privileged as advisory, deliberative information. FGP's request for "any study, analysis or other document" describing Taxation's "audit and appeal resources devoted to" examining, auditing, or appealing any "partnership issues" arising from NJ-1065s or other related returns or schedules, for FYs 2008-2012, including "auditor or conferee headcount," time spent on audits, and "any other measure of audit or appeal resources," was denied as overbroad and vague.

[22] The CBT Act imposes a minimum "tax" on any corporate entity domestic or foreign at a flat amount which until 2005 was not based on any factor, and then from 2006 onwards was "based on the New Jersey gross receipts" at amounts ranging from $500 (gross receipts of less than $100,000) to $2,000 (for gross receipts of $1 million or more). See N.J.S.A. 54:10A-5(e). Different amounts were imposed on S corporations. Ibid.

"privilege" of exercising a corporate franchise, does not vary by shareholder count. Thus, a large corporation with several hundred shareholders will certainly not pay $250,000 as would FGP.[23]

Since neither FGP nor Taxation provided any data, evidence or other proof on why the PFF fails or passes the Pike balancing, should that test even apply here, the court finds that grant of summary judgment in this regard to either party is inappropriate.

**CONCLUSION**

For the aforementioned reasons, the court finds that the Challenged Statute, N.J.S.A. 54A:8-6(b)(2) does not implicate or violate the DCC because it imposes the PFF to defray the costs of a purely intrastate governmental activity, which is to review partnership and partner returns, in order to track whether New Jersey sourced income/loss was reported to New Jersey. Therefore, and only to this extent, namely, that because the PFF does not implicate the DCC, Taxation's motion for partial summary judgement is granted.

Plaintiff's motion for partial summary judgment should also be denied because (1) the Challenged Statute is commerce neutral, and (2) FGP has not provided any proof of disparate impact on interstate commerce, which is its investment activity. Merely relying on the mathematical computation of a hypothetical amount under the internal consistency test does not satisfy FGP's burden to prove disparate impact on interstate commerce. That Taxation

---

[23] Further, charging $150 per-partner for a small partnership, but providing a volume discount of about $3-$4 per-partner for a large partnership such as FGP, while may not implicate the DCC or the Pike test, nonetheless raises concerns. If the BTRA intended to level the playing field between large and small businesses so that so that tax revenues are not minimized due to sophisticated planning engaged by large entities, the $250,000 cap subverts that purpose inasmuch as it reduces the cost per-partner in a large firm, as compared to a small firm. Note that the court's findings here are restricted solely to the DCC analysis, and the application of Pike in that context. Therefore, the court's above conclusion does not mean that the PFF cannot be deemed excessive or unreasonable under any other constitutional or legal reasons.

promulgated regulations providing a limited apportionment of the fee does not state a claim for violation of DCC, which regulations, in any event, exceed the plain language and intent of the Challenged Statute.

Finally, should the balancing test of <u>Pike</u> apply, FGP has not proven excessive burden on interstate commerce, and Taxation has not proven the contrary. Thus, both parties' motions for partial summary judgment are denied as to this aspect.

Very truly yours,

Mala Sundar, J.T.C.